[Civil No. 3566.   Filed December 7, 1934.]

[38 Pac. (2d) 878.]

In the Matter of the Application of WILLIAM FORSSTROM and LUELLA B. FORSSTROM, His Wife, for a Writ of Prohibition.

474

Mr. Ben C. Hill, Messrs. Mathews & Bilby and Messrs. Darnell & Nave, for Petitioners.

Mr. Thos. J. Elliott, City Attorney, Mr. Edward P. Cline and Messrs. Knapp, Boyle & Thompson, for Respondents.

Mr. Arthur T. La Prade, Attorney General, and Mr. J. R. McDougall, Assistant Attorney General, *Amici Curiae.*

LOCKWOOD, J.—This is an original petition in this court on the application of William Forsstrom and Luella B. Forsstrom, his wife, hereinafter called petitioners, for a writ of prohibition forbidding the superior court of Pima county from proceeding with a certain action pending in said court, being No. 15750, between the city of Tucson, a municipal corporation, as plaintiff, and petitioners and various other parties as defendants, which action is for a condemnation of certain easements of ingress and egress belonging to the lands owned by petitioners, to the extent that said easements will be taken by the construction of a certain subway and the necessary regrading of North Stone Avenue and East Sixth Street in said city of Tucson. The alternative writ was duly issued, and the matter is before us now on the return thereto.

The question is solely one of law, and the facts may be briefly stated as follows: The main tracks of the Southern Pacific Railroad cross North Stone Avenue near such intersection of Sixth Street at the present grade of said avenue. The properly constituted authorities of the city of Tucson, believing that such grade crossing is a menace and hazard to public travel on the street, determined to abolish it by the construction of an underpass or subway below the tracks, and in pursuance thereof adopted resolution No. 1329, declaring the present grade crossing to be a dangerous hazard to vehicle and pedestrian traffic on North Stone Avenue, and authorizing the elimination of the crossing by means of an underpass, to be constructed under the provisions of the National Industrial Recovery Act (48 Stat. 195) and in accordance with an agreement entered into between the state of Arizona and the city of Tucson. Certain plans and specifications prepared by the state highway engineer were adopted as the official plans, specifications, and drawings for the underpass, and the city attorney was authorized and directed to bring such proceedings by way of eminent domain as were necessary to condemn property required by the construction of the underpass. Petitioners are the owners of certain real property abutting on Stone Avenue and Sixth Street which will be affected by such improvement through a changing of the grades of Stone Avenue and Sixth Street, which will make ingress and egress to their premises more difficult.

There are several other matters which we will refer to as necessary, but the propositions of law upon which petitioners base their main argument in their application for the writ may be stated in their logical sequence as follows: (a) Section 17, article 2, of the Constitution of Arizona, which reads in part as

follows: "Section 17. . . . No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner, . . . " prohibits the taking or damaging of private property for public use until just compensation is made to the owner; (b) this section of the Constitution above quoted is not self-executing, but requires legislation to put it into effect; (c) the only provisions of the statutes providing a method for exercising the right of eminent domain are found in chapter 23 (section 1329 et seq.), Revised Code of 1928; (d) this chapter refers only to the "taking" of property, and provides no method of ascertaining the compensation for "damaging" property; (e) the proposed action of the city is not a "taking," but is a "damaging," of petitioners' property. We will consider these propositions of petitioners in their order. A mere examination of the Constitution and statutes shows (a) and (c) to be correct, and (b) has been determined in *Inspiration Con. Copper Co.* v. *New Keystone Copper Co.,* 16 Ariz. 257, 144 Pac. 277. We next consider whether chapter 23, *supra,* applies to the "damaging," as well as the "taking," of property.

Our legislature first dealt with the subject of eminent domain in the Code of 1887. Title 22 of that Code covers the subject and defines eminent domain as being " . . . the right of the people or government to *take* private property for public use. . . . " (Italics ours.) And the entire chapter mentions solely the "taking" of property; no provision appearing for providing compensation where property was *damaged* without being *taken.* In the Code of 1901, title 21 (paragraph 2444 et seq.) was devoted to the same subject and the definition thereof again referred only to the "taking" without mentioning

"damaging" of property, and the procedure set forth in the chapter, although going somewhat more into details in regard to the purposes for which the right might be exercised, still referred only to the taking. Until February 14, 1912, the territory of Arizona was subject entirely to the will of Congress and the limitations of the Federal Constitution. *Territory* v. *Blomberg*, 2 Ariz. 204, 11 Pac. 671. And, so far as eminent domain was concerned, the only limitation on the legislature was the Fifth Amendment to that Constitution, which does not require compensation for the "damaging" of property, but for the "taking" only. When Arizona was admitted to statehood our Constitution forbade either the "taking" or "damaging" of property. But, notwithstanding this addition of the word "damaging" in the Constitution, the definition of eminent domain in the first state Code of 1913 (paragraph 3071 et seq.) is again found in the same language as in the Codes of 1887 and 1901, and all provisions in the chapter referring to the procedure for exercising the right again mention only a "taking" and not a "damaging" of property. In the Code of 1928 for the first time eminent domain is not defined, and there are a number of consolidations and shortenings of the provisions of the previous codes. Nowhere, however, is there anything set forth therein which would lead us to believe that it was the intention of the legislature to add anything to the nature of the right as previously established, and we think that, following our previous constructions of the 1928 Code, we must assume that the law as it existed previously to the enactment of that Code was not changed in substance, since it does not expressly appear that any change was intended. *In re Estate of Sullivan*, 38 Ariz. 387, 300 Pac. 193. We hold, therefore, that, whether through inadvertence

or intention, the legislature has failed to provide any method for assessing the compensation due for the ''damaging'' of property as distinct from its ''taking'' under eminent domain, and that since, under the constitutional provision above quoted, it may not be so damaged without compensation having been first ascertained and paid, if the action of the city is a ''damaging'' of petitioners' property, as distinct from a ''taking,'' there is no method set forth in our statutes by which such damage may be ascertained, and the right may not be exercised until the legislature has acted.

We come then to the question as to whether the proposed action of the city of Tucson, in so far as it affects petitioners at all, is a ''taking'' within the meaning of the statute.

Eminent domain is the right and power of a sovereign state to appropriate private property to particular uses, and it embraces all cases whereby under the authority of the state the property of the individual is appropriated permanently without his consent, for the purpose of being devoted to some particular use for the public good. This right is an inherent one which pertains to sovereignty as a necessary, constant and unextinguishable attribute, and constitutional provisions in regard to it do not create or grant the power, but are limitations thereon. But the right has always carried with it, even in the absence of constitutional limitations, the principle that in some manner and to some extent compensation must be made for its exercise.

In order that we may understand the better what is meant by a ''taking'' of property, we should have a clear knowledge of what property really is. The word is used at different times to express many varying ideas. Sometimes it is taken in common parlance

to denote a physical object, as where one says an automobile or a horse is his property. On careful consideration, however, it is plain that "property" in the true and legal sense does not mean a physical object itself, but certain rights over the object. A piece of land in an unexplored and uninhabited region which belongs to no one does not necessarily undergo any physical change merely by reason of its later becoming the property of any person. A wild animal may be exactly the same physically before and after it is captured, but, when it is running free in the forest, no one would speak of it as property. We must therefore look beyond the physical object itself for the true definition of property. Many courts and writers have attempted to define it, using different words, but meaning in essence the same thing. One of the great writers on jurisprudence says:

"Property is entirely the creature of the law. . . . There is no form, or color, or visible trace, by which it is possible to express the relation which constitutes property. It belongs not to physics, but to metaphysics; it is altogether a creature of the mind." Bentham Works, ed. 1843, vol. 1, p. 308.

" . . . Property itself, in a legal sense, is nothing more than' the 'exclusive right of possessing, enjoying, and disposing of a thing.' . . . " *Chicago & Western etc. R. R. Co.* v. *Englewood etc. Co.*, 115 Ill. 375, 4 N. E. 246, 249, 56 Am. Rep. 173.

"Property, in its broader and more appropriate sense, is not alone the chattel or the land itself, but the right to freely possess, use, and alienate the same; and many things are considered property which have no tangible existence, but which are necessary to the satisfactory use and enjoyment of that which is tangible." *City of Denver* v. *Bayer,* 7 Colo. 113, 2 Pac. 6.

"It is used in the constitution in a comprehensive and unlimited sense, and so it must be construed. . . . It need not be any physical or tangible property which is subjected to a tangible invasion. . . . The

right to light and air and access is equally property.
. . . '' *State* v. *Superior Court,* 26 Wash. 278, 66
Pac. 385, 388.

We think that ''property'' may well be defined as
the right to the possession, use and disposition of
things in such manner as is not inconsistent with law.
Lewis, Eminent Domain, vol. 1, p. 54. When real
property is considered, a man has not only rights
of use, of possession and disposition in a particular
area of land, but he has at times other rights over
contiguous and surrounding areas affecting the use
of the particular area, and these are as much his
property as the right to the use of the area he
possesses. Such, for instance, are the right to the
support of soil, to light and air, to access, the right
to be undisturbed by nuisances on the adjoining prop-
erty, and similar matters. Of course, these rights
vary greatly in accordance with circumstances, but,
whenever they do exist, and to the extent to which
they are secured by law, they are truly property as
much as the right to use the land to which they apper-
tain. It would follow from these definitions and
explanations of the meaning of the term ''property''
that since it consists, not in tangible things them-
selves, but in certain rights in and appurtenant to
them, it would logically follow that, when a person is
deprived of any of these rights, he is to that extent
deprived of his property, and that it is taken in the
true sense, although his title and possession of the
physical object remains undisturbed. Any substan-
tial interference, therefore, with rights over a phys-
ical object which destroys or lessens its value, or by
which the use and enjoyment thereof by its owner is
in any substantial degree abridged or destroyed, is
both in law and in fact a ''taking'' of property. It
is apparently only of recent years that the meaning

of the word "taking," when used in regard to eminent domain, has been properly understood by the majority of the courts, although it would seem obvious that a careful analysis of the true nature of "property" would have shown it long since.

In 1857 one of the great writers on constitutional law said:

" . . . It seems to be settled that, to entitle the owner to protection under this clause, the property must be actually taken, in the physical sense of the word, and that the proprietor is not entitled to claim remuneration for indirect or consequential damage, no matter how serious or how clearly and unquestionably resulting from the exercise of eminent domain." Sedgwick, Const. Law, 2d ed., pp. 456–458.

But the author, while recognizing the weight of authority was then as just stated, added: " . . . I cannot refrain from the expression of the opinion, that this limitation of the term taking to the actual physical appropriation of the property or a divesting of title is, it seems to me, far too narrow a construction to answer the purposes of justice, or to meet the demands of an equal administration of the great powers of government, . . . " and the later and better reasoned cases on this subject since Mr. Sedgwick expressed his views have vindicated him. Probably one of the earliest and perhaps the leading case taking this view of the word is *Eaton* v. *B., C. & M. R. Co.*, 51 N. H. 504, 12 Am. Rep. 147. Therein the court said:

" . . . From the very nature of these rights of user and of exclusion, it is evident that they cannot be materially abridged without, *ipso facto,* taking the owner's 'property.' If the right of indefinite user is an essential element of absolute property or complete ownership, whatever physical interference annuls this right takes 'property,'—although the owner may still have left to him valuable rights (in the article) of a

more limited and circumscribed nature. He has not the same property that he formerly had. Then, he had an unlimited right; now, he has only a limited right. His absolute ownership has been reduced to a qualified ownership. Restricting A's unlimited right of using one hundred acres of land to a limited right of using the same land, may work a far greater injury to A than to take from him the title in fee simple to one acre, leaving him the unrestricted right of using the remaining ninety-nine acres. Nobody doubts that the latter transaction would constitute a 'taking of property.' Why not the former?"

And in *Thompson* v. *Androscoggin River Imp. Co.*, 54 N. H. 545, the court discussed fully and approvingly the Eaton case, and stated:

"Property in land must be considered, for many purposes, not as an absolute, unrestricted dominion, but as an aggregation of qualified privileges, the limits of which are prescribed by the equality of rights, and the correlation of rights and obligations necessary for the highest enjoyment of land by the entire community of proprietors. . . . "

Many of the states of the Union whose constitutions use the words "taken" or "appropriated" or "applied," without including the word "damaged" in their provisions relating to eminent domain, have discussed the question of what is meant by the "taking" of property. We quote briefly from a few of these:

In *Grand Rapids Booming Co.* v. *Jarvis*, 30 Mich. 308, the court said:

" . . . It is a transparent fallacy to say that this is not a taking of his property, because the land itself is not taken, and he utterly excluded from it, and because the title, nominally, still remains in him, and he is merely deprived of its beneficial use, which is not the property, but simply an incident of property. Such a proposition, though in some instances something very like it has been sanctioned by courts, can-

not be rendered sound, nor even respectable, by the authority of great names. Of what does property practically consist, but of the incidents which the law has recognized as attached to the title, or right of property? Is not the idea of property in, or title to lands, apart from, and stripped of all its incidents, a purely metaphysical abstraction, as immaterial and useless to the owner as 'the stuff that dreams are made of?' Is it not a much less injury to him, if it can injure him at all, to deprive him of this abstraction, than of the incidents of property, which alone render it practicably valuable to him? And among the incidents of property in land, or anything else, is not the right to enjoy its beneficial use, and so far to control it as to exclude others from that use, the most beneficial, the one most real and practicable idea of property, of which it is a much greater wrong to deprive a man, than of the mere abstract idea of property without incidents? This use, or the right to control it with reference to its use, constitutes, in fact, all that is beneficial in ownership, except the right to dispose of it; and this latter right or incident would be rendered barren and worthless, stripped of the right to the use. Property does not consist merely of the right to the ultimate particles of matter of which it may be composed,—of which we know nothing—but of those properties of matter which can be rendered manifest to our senses, and made to contribute to our wants or our enjoyments."

In *Old Colony etc. Ry. Corp.* v. *Plymouth,* 14 Gray (Mass.) 155, it is said:

"Nor is it in our judgment material whether the property thus taken or appropriated is real estate held in fee, or an easement or lien upon real estate, or personal property. The word 'property' in the tenth article of the Bill of Rights, which provides that 'whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor,' should have such a liberal construction as to include every valuable interest which can be enjoyed as property and recognized as such.

"Nor is it material whether the property is removed from the possession of the owner, or in any respect changes hands; if it is of such a character and so situated that the exercise of the public use of it, as warranted by the legislature, does in its necessary natural consequences, affect the property, by taking it from the owner, or depriving him of the possession or some beneficial enjoyment of it, then it is 'appropriated' to public use by competent authority, and the owner is entitled to compensation.''

In *Trenton Water Power Co.* v. *Raff,* 36 N. J. Law 335, the following language is used:

"The destruction of private property, either total or partial, or the diminution of its value by an act of the government, directly, and not merely incidentally affecting it, which deprives the owner of the ordinary use of it, is a taking within the meaning of the constitutional provision, and the power can only be exercised under the right of eminent domain, subject to the constitutional limitation of making just compensation. *American Print Works* v. *Lawrence,* 1 Zab. [21 N. J. Law] 248; *Hale* v. *Lawrence,* Ib. [21 N. J. Law] 714 [47 Am. Dec. 190]; *Glover* v. *Powell,* 2 Stockt. [10 N. J. Eq.] 211; Cooley on Const. Lim. 544. . . . ''

The Supreme Court of Missouri has twice had the question under consideration. In *Thurston* v. *City of St. Joseph,* 51 Mo. 510, 11 Am. Rep. 463, it discusses the rights of a lot holder with reference to adjacent streets and alleys as follows:

"What are the rights of a lot holder in reference to the adjacent streets and alleys? The owner in fee of a tract of land may have it surveyed into town lots, streets and alleys; and without selling any of the lots or acknowledging the plat, he may destroy the survey and vacate the streets and alleys. But if he convey away any of the lots, the right of the free use of the adjacent streets will pass to the grantees as appurtenant to their lots; and such grantees will not only have a servitude or easement in the adjacent streets

and alleys as appurtenant to the lots, but the conveyance itself would be a dedication of the streets and alleys to the public as well as to the private use of the lots. This would be the result without any statutory dedication by acknowledging and filing the plat with the county recorder. The effect of a statutory dedication, however, is precisely the same. It vests in the adjacent lot holder, the right to the use of the streets as appurtenant to his lot, and this easement is as much property as the lot itself. It is a property interest, independent of the right of the public to use and improve the streets as public highways, and the lot holder is as much entitled to protection in the enjoyment of this appurtenant easement as he is in the enjoyment of the lot itself. . . . ''

And later in *Broadwell* v. *City of Kansas*, 75 Mo. 213, 42 Am. Rep. 406, it said:

''Moreover, section 16 of article 1 of the constitution of 1865, provided that: 'No private property ought to be taken or applied to public use, without just compensation.' Here the city and its servant took the property of plaintiffs within the meaning of that section. The taking of property within that prohibition may be either total or absolute, or a taking *pro tanto.* 'Any injury to the property of an individual which deprives the owner of the ordinary use of it, is equivalent to a taking and entitles him to compensation. So a partial destruction or diminution of value of property by an act of the government which directly and not merely incidentally affects it, is to that extent an appropriation. . . . ' ''

In *Forster* v. *Scott,* 136 N. Y. 577, 32 N. E. 976, 977, 18 L. R. A. 543, the New York Court of Appeals said:

'' . . . Whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment that materially affects its value, without legal process or compensation, it deprives him of his property, within the meaning of the Constitution. All that is beneficial in property arises from its use and the fruits

of that use, and whatever deprives a person of them deprives him of all that is desirable or valuable in the title and possession. It is not necessary, in order to render a statute obnoxious to the restraints of the Constitution, that it must, in terms or in effect, authorize an actual physical taking of the property or the thing itself, so long as it affects its free use and enjoyment, or the power of disposition at the will of the owner. . . . "

The question was before the Supreme Court of Vermont in *Foster* v. *Stafford National Bank,* 57 Vt. 128, 133, and they defined "taking" as follows:

"It is claimed that there was no such taking of the property of the defendant as entitled him to compensation. Any injury to the property of an individual which deprives him of the ordinary use of it, is equivalent to a taking, and entitles him to compensation. . . . "

The Court of Errors and Appeals in New Jersey in *City of Passaic* v. *Paterson Bill Posting etc. Co.,* 72 N. J. Law 285, 62 Atl. 267, 111 Am. St. Rep. 676, 5 Ann. Cas. 995, said:

" . . . It is obvious that the effect of the ordinance is to deprive the landowner of the ordinary use for a lawful business purpose of a portion of his land. Such deprivation is a taking within the meaning of the constitutional provision (*Trenton Water Power Co.* v. *Raff,* 36 N. J. Law 335, approved by this court in *Pennsylvania R. R. Co.* v. *Angel,* 41 N. J. Eq. 316, 7 Atl. 432, 56 Am. Rep. 1); and where no compensation is given to the landowner, the taking can only be justified if it is done in the exercise of the police power of the state."

In *Evansville & Crawfordsville R. R. Co.* v. *Dick,* 9 Ind. 433, the Supreme Court of Indiana construes their constitutional provision in the following language:

" . . . The constitution (art. 1, § 21) says, 'No man's property shall be taken by law, without just

compensation.' As we are advised, a proper construction of the word 'taken' makes it synonymous with seized, injured, destroyed, deprived of. It is, therefore, evident that the legislature have no power to authorize, in any case, either a direct or consequential injury to private property, without compensation to the owner. . . . ''

We are satisfied that the word "taking," when used in constitutions or statutes in regard to property, and particularly realty, includes the permanent taking or diminishing of any of the rights which one has by reason of and appurtenant to his ownership of the realty in question, as well as a deprivation of the title to the physical object.

But, say petitioners, it is held almost universally that no compensation is required, in the absence of an express statutory or constitutional provision granting it, when a city changes the grade of a street, and it is argued from that that such change must necessarily not be a taking, or else it would have been held that compensation was due therefor. It is true that in the overwhelming majority of cases involving injuries done to property through the alteration of established grades it has been held that no compensation may be recovered in the absence of a special statute authorizing it. At first thought, this would seem to sustain petitioners' position, but a careful examination of the cases and the reasoning which supports them throws a different light on the subject. It will be found on examining all these cases that, wherever the principle involved was reasoned out, the decision was based on one of three grounds: (a) That this species of damage is not a "taking" within the meaning of the Constitution, and consequently, if the change is authorized by law, no action will lie; (b) that the public is the owner of the fee of the street, and stands in the same relation to the

abutting property owners as an individual would who owned the land which constitutes the street, and it may therefore deal with its own land as could a private owner; and (c) that, when a street or highway is first laid out, compensation is presumably given once and for all, not only for the land actually taken, but for all future damages which may be occasioned by future necessity requiring the changing of the surface of the street to meet changing public needs. The very purpose of establishing streets in a city is to afford access, light, and air to the property through which they pass, and it is therefore generally held that all lots abutting upon a street have these easements appurtenant thereto. This right of access extends to the use of the street as an outlet from the abutting property by any mode of travel or conveyance appropriate to the highway in such manner as is customary or reasonable. If this be true, then, even assuming the public is the proprietor of the streets in the same sense as an adjoining lot holder, if there be an easement or passage over the adjoining lot, it certainly could not be abolished or narrowed by the owner of the servient tenement without compensation therefor. The only logical reason on which the street grade cases can be sustained, in our opinion, is that, when the street or highway is first laid out and compensation given to the abutting property owners, or waived by them, it is with the knowledge and implied agreement on the part of the property owner that the various exigencies of changed circumstances may require a change in the grade, and that such has been considered by all the parties in determining the amount of compensation originally paid. It is true that some courts of the highest standing have held a change of grade is not "taking." *Northern Transp. Co.* v.

*Chicago,* 99 U. S. 635, 642, 25 L. Ed. 336; *Chicago* v. *Taylor,* 125 U. S. 161, 8 Sup. Ct. 820, 31 L. Ed. 638; *Rigney* v. *Chicago,* 102 Ill. 64. In the case first cited, involving the interference with the right of access from a street to a lot, it is said:

"But acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. . . . This is supported by an immense weight of authority. Those who are curious to see the decisions will find them collected in Cooley on Constitutional Limitations, page 542 and notes. . . . No entry was made upon the plaintiffs' lot. All that was done was to render for a time its use more inconvenient."

We agree with the result reached in that case, but, while we have the most profound respect for any decision made by that court, and its reasoning, even Jove nods at times, and we are satisfied that its conclusion that the reason for the rule laid down in regard to changes in the street grade is that there is no "taking" of any property in the constitutional meaning of the term is unsound logically and not supported even by the better authorities cited in the opinion. We have examined the text of Cooley on Constitutional Limitations and the cases therein cited on this question. Mr. Cooley says:

" . . . A strong inclination is apparent to hold that, when the fee in the public way is taken from the former owner, it is taken *for any public use whatever* to which the public authorities, with the legislative assent, may see fit afterwards to devote it, in furtherance of the general purpose of the original appropriation; and if this is so, *the owner must be held to be compensated at the time of the original taking for any such possible use;* and he takes his chances of that use, or any change in it, proving beneficial or deleterious to any remaining property he may own

or business he may be engaged in, . . . '' (Italics ours.)

In *Callender* v. *Marsh*, 1 Pick. (Mass.) 418, it is said:

'' . . . The streets on which the plaintiff's house stands, had become public property by the act of laying them out conformably to law, and the value of the land taken must have been either paid for, or given to the public, at the time, or the street could not have been legally established. Being legally established, although the right or title in the soil remained in him from whom the use was taken, yet the public acquired the right, not only to pass over the surface in the state it was in when first made a street, but the right also to repair and amend the street, and for this purpose, to dig down and remove the soil sufficiently to make the passage safe and convenient. . . . ''

Justice COOLEY in *City of Pontiac* v. *Carter*, 32 Mich. 164, cites approvingly the case just quoted from, and says:

'' . . . When the land was taken for the street, if damages were assessed, they would cover this possible injury, and it could never be known subsequently, that the jury in estimating them did not calculate upon a change in the grade of the proposed street as probable, and attach considerable importance to it in their estimate. It is matter of common observation that much beyond the value of land taken is sometimes given in these cases; not because of any present injury, but because contingencies cannot be fully foreseen. And the rule in such cases is, that all possible damages are covered by the award, except such as may result from an improper or negligent construction of the public work, or from an excess of authority in constructing it. In other words, the award covers all damages resulting from the doing in a proper manner whatever the public authorities have the right to do, but it does not cover injuries from negligence, or from trespasses. [Citing cases.] And one who gives his land for the purposes of a

public way is supposed to contemplate all the same contingencies, and to make the gift on the supposition that the incidental benefits will equal or exceed all possible incidental injuries.''

We are of the opinion that in reason and logic the reason for the rule that the grade of a street may be changed without paying compensation to the property owner for the invasion of his right of access is not that such an invasion is not a taking, or that the public has the right to deal with the street as its own regardless of the rights of the abutting property owners, but rather that the law presumes that, when the street is first laid out and the ground of the property owner taken or voluntarily given for that purpose, the compensation to which he is then entitled, and which will be given him if he desires it, pays not only for the original ground taken, but for any further taking of the easement of access which may be made necessary by subsequent changes in the grade of the street. Such being the law, in the absence of some specific provision to the contrary, the city of Tucson might alter the grades in question at pleasure, without the payment of further compensation therefor, for the reason that, when Stone Avenue and Sixth Street were first laid out, compensation was presumably made to cover, not only the original grades, but any changes which might at a later time be made therein. The legislature, however, of course has the right to grant additional compensation for the subsequent taking of property through the change in grade, and in this state it has done so. This provision first appears as paragraph 465, Revised Statutes of 1901. It was carried down in substance as paragraph 1897, Revised Statutes of 1913, and appears as subdivision 17 of section 408, Revised Code of 1928. The section grants various powers to all

municipal corporations, and subdivision 17 reads as follows:

"17. To establish and alter the grade of streets, alleys and sidewalks, and to regulate the manner of using the streets and pavements in the city to protect the same from injury by vehicles driven thereon; but no street or sidewalk grade shall be altered after the same has once been established and built to, unless compensation be made to abutting owners for damages done their property by such change."

The legislature has therefore expressly provided that, in case a municipality desires to take any part of the right of access to a lot, after a grade has once been established, it must pay such additional damages as may have accrued to the abutting property owner by reason of such additional taking.

It is urged by petitioners that we have previously held in *Mosher* v. *City of Phoenix*, 39 Ariz. 470, 7 Pac. (2d) 622, 627, that the changing in a grade is "damage" as distinct from "taking." We did in that case say as follows:

" . . . Our Constitution provides that property shall not be 'taken or damaged' without just compensation therefor. Article 2, § 17. Under provisions like this, it is generally held that a change in the established grade of a street, which injuriously affects the value of adjoining property, is 'damage.' 20 C. J., p. 694, and notes. The damage is to the easement of ingress and egress. *Eachus* v. *Los Angeles etc. Ry. Co.*, 103 Cal. 614, 37 Pac. 750, 42 Am. St. Rep. 149; *Rigney* v. *City of Chicago*, 102 Ill. 64. . . . "

But in that case the question as to the meaning of the word "taking," as found in our statutes and Constitution, and the true reason for the rule in regard to the changing of street grades, was not presented and argued to us, and therefore was not thoroughly considered by us. We are of the opinion, after a

careful examination and review of all the authorities, that the changing of a street grade which lessens the enjoyment of the easement of ingress and egress is within the true meaning of the constitutional provision a taking of the property, and anything we have said in *Mosher* v. *City of Phoenix, supra,* to the contrary is expressly overruled.

We hold, therefore, that chapter 23, Revised Code of 1928, for the foregoing reasons does provide a method whereby the damage caused to abutting property owners on a street through the taking of any portion of their right of ingress and egress thereto may be assessed, and that, unless some other reason preventing it appears, the city of Tucson, on the facts stated in the petition, was authorized to proceed with its action, under chapter 23, *supra.*

We consider then whether there is any other reason why the city may not maintain its action. It is urged that the complaint shows upon its face that the defendants' property sought to be taken is not one of the estates which the law provides may be condemned. Section 1333 of chapter 23, *supra,* on which reliance is placed to sustain this position, reads as follows:

"1333. *Estates Subject to Condemnation.* The interests, estates and rights in lands subject to be taken for public use, are: A fee simple, when taken for public buildings or grounds or for permanent buildings, for use in connection with a right-of-way, or for an outlet for the flow or a place for the deposit of tailings from a mine or for irrigating ditches; an easement, when taken for any other use; a right of entry upon and occupation of lands, and the right to take therefrom such earth, gravel, stone, trees, and timber as are necessary for some public use; and use in the water of any stream, river or spring."

It is contended that the only rights which may be condemned are: (a) Fee simples; (b) easements; (c)

rights of entry; and (d) use in certain waters. We think counsel misapprehend the meaning of the section. When read in connection with section 1334, immediately following, in our opinion it appears clearly that section 1333 does not refer to the *rights to be condemned,* but to the character of *right which is acquired* by the state in the property condemned. Such being the case, since the property taken is to be used in connection with a right of way, when the city exercises its right of condemnation, it acquires under the statute a "fee simple" title to the property taken. It will doubtless be urged that, since the property acquired is itself merely the easement of ingress and egress, a fee-simple title to such property cannot be acquired. It is true that ordinarily the words "fee" and "fee simple" are applied to an estate in land, but this is not necessarily their only meaning. Blackstone says that they are applicable to and may be had in any kind of hereditament either corporeal or incorporeal. *Oswald* v. *Wolf,* 126 Ill. 542, 19 N. E. 28. And in *Brooklyn Elevated R. R. Co.* v. *City of Brooklyn,* 2 App. Div. 98, 37 N. Y. Supp. 560, the franchise which a street railroad obtained to use the streets of a city is held to be properly a fee. We are of the opinion that the true meaning of the word is simply all the property in the thing referred to, or, in other words, the largest estate therein which a person may have. *McMillen* v. *Anderson,* 95 U. S. 37, 24 L. Ed. 335; *Jordan* v. *Record,* 70 Me. 529. We think, therefore, that, when any right or interest in land is taken by eminent domain for use in connection with a right of way, the words "fee simple" in section 1333 are intended to mean that, whatever the right or interest taken may be, it is taken in its entirety and as a perpetuity. The property which may be taken is described in section 1334. This section, after setting

forth various specific kinds of property, some of which pertain to realty and others merely to franchises, adds as a final subdivision:

" . . . All classes of private property not enumerated, including property for use in water or water rights, may be taken for public use, when such taking is authorized by law.''

We think this language is amply broad to include the taking of a right of ingress and egress for a right of way, and, when it is taken for a street, the public gets a fee-simple title to the right to the extent to which it is taken.

The next objection is that the city council did not determine the necessity of taking the petitioners' property, but delegated that authority to the city attorney, and it is urged that such authority cannot be delegated, but must be exercised exclusively by the council. We have examined the resolution adopted by the council providing for the doing of the work. After reciting the necessity for the work, it continues:

"Section 3. That the plans and specifications now on file in the office of the State Highway Engineer, State Highway Department, Phoenix, Arizona, and in the office of the City Engineer of the City of Tucson, Arizona, which plans and specifications are known as 'National Recovery Municipal Project No. 9 for Arizona—Stone Avenue Underpass,' be and the same are hereby adopted as the official specifications, plans, drawings and forms for said Stone Avenue underpass.

"Section 4. That the City Attorney be and he is hereby authorized and directed to bring such proceedings by way of eminent domain as are necessary, to condemn property required for the construction of said underpass and to ascertain the property damages, if any, to be incurred thereby.''

It is permissible for a legislative body, by reference to something already in existence, to incorporate that

thing as part of a law or ordinance. *Scottish Union & National Ins. Co.* v. *Phoenix T. & T. Co.*, 28 Ariz. 22, 235 Pac. 137. The plans and specifications referred to are definitely identified as something in existence, and it appears that they show specifically and distinctly on their face just what property will have its right of ingress and egress affected by the proposed underpass and to what extent. Such being the case, the provisions of section 4 directing the city attorney to bring proceedings by way of eminent domain to condemn property required necessarily refers to the property affected as shown by the plans and specifications which are made a part of the ordinance, and leaves him no discretion in determining what property he is required to condemn. We think the ordinance does not improperly delegate any authority to the city attorney to determine what property shall be condemned.

Since the superior courts of this state have jurisdiction to hear proceedings for condemnation of property by eminent domain, and since the ordinance providing for the condemnation of the property of petitioners appears to be constitutional, and within the powers of the city of Tucson, and since the property sought to be condemned is to be "taken" within the true meaning of the Constitution, the superior court has jurisdiction to proceed with the said suit No. 15750 under the provisions of chapter 23, *supra*. The alternative writ of prohibition heretofore issued is quashed.

ROSS, C. J., and McALISTER, J., concur.