206 P.2d 1168

**MARICOPA COUNTY MUNICIPAL WA-
TER CONSERVATION DIST. NO. 1
v. WARFORD et ux.**

No. 5104.

Supreme Court of Arizona.

May 31, 1949.

Rehearing Denied July 16, 1949.

Whitney, Ironside & Whitney, of Phoenix for appellant.

Darrel R. Parker, of Phoenix, for appellees.

De CONCINI, Justice.

L. A. Warford et ux., plaintiffs below, appellees here filed their complaint against appellants, et al. The other defendants were either dropped or the action against them dismissed. The case went to trial on appellees' first amended complaint and ther supplemental complaint filed the day of the trial. Appellant will hereafter be referred to as the District and appellee Warford as plaintiff.

The District was organized about the year 1925 to reclaim raw desert land for agricultural purposes. The District comprises some 35,000 acres, approximately 25 miles northwest of Phoenix. In 1927-1928 the District built its main canal and several laterals through which the water flowed to the land to be irrigated. The main canal, which runs in a southwesterly direction along the north side of the District acreage, was intercepted by Trilby wash at the west end of Lateral 3. The main canal was paralleled by a protective drainage ditch built by the District in 1927 or 1928. In 1935-1936 the District built an embankment 4 feet high paralleling the main canal for about one-fourth of a mile, then due north for 1¾ miles, thence due east for 1¼ miles to protect the main canal from surface waters.

At the junction of the main canal with Trilby wash, the District installed a siphon under the wash to carry the flow of the canal and not impede the run-off down the wash. The protective drainage ditch and embankment caused surface waters to be diverted away from the main canal directly to the natural bed of Trilby wash which ran southeasterly through the District's land and would have continued so except for the action of the District in digging a diversion channel along the north side of Lateral 5 which ran directly east. The purpose of diverting Trilby wash waters easterly was to protect the land within the District to the southeast from its ravages. The District is located so that an area of approximately 195 square miles drains through it via Tribly wash. Normally the wash is dry, but when rains descend in the watershed the wash runs a varying stream of water.

In 1939 a heavy rain fell and the waters carried by Trilby wash burst over Lateral 5 damaging both the lateral and land to the south, but did not reach plaintiffs' land. In 1941 and 1942 the District widened and deepened the ditch north of Lateral 5 and threw dirt up against the north side of the lateral to protect it from Trilby's diverted waters. The District has periodically repeated this process up to the date of the trial early in September, 1947. The court has had a map prepared from the evidence in the file. This map is attached hereto for illustrative purposes only.

Plaintiff has resided and farmed in this locality since 1937 and was aware of the District's work to alleviate flood conditions along Lateral 5. Plaintiff purchased by verbal contract from one Mrs. Minnie McMurtry the NW¼ of section 9 in 1941, went into possession and cleared 40 acres of it. On September 24, 1942, he took a written option on the same land and paid some money on account. In 1944 the deed was placed in escrow at the Phoenix National Bank. In 1945 or 1946 plaintiff purchased the NW¼ of the SW¼ of section 9 from the same grantor increasing his holdings to a total of 200 acres all of which was in T. 3 N., R. 1 W., G. & S. R. B. & M., Maricopa County. In 1942 the District extended its diversion canal from Trilby wash to the northwest corner of plaintiff's land. In 1943 water overflowed a little of his cotton land but did no appreciable damage.

In 1946 plaintiff had a well drilled and pump installed at a cost of $14,000. He levelled and plowed his land and planted cotton. During the summer of 1946 water came down the artificially created diversion channel and flooded about 70 acres of his land.

Plaintiff's complaint was brought on the theory of inverse eminent domain, Art. 2, Sec. 17, Ariz.Const., in that the District took his land by reason of such flooding. He alleged he was damaged to the extent of $30,000. His supplemental complaint filed the day of the trial prayed for damages in the sum of $11,700 for crop loss resulting from the 1947 summer floods.

■ The lower court made findings of fact and gave judgment to plaintiff. The District appeals from the judgment listing a number of assignments of error. Seventeen of them intermingled with other alleged errors supported by eight propositions of law are directed to the findings of fact. In whole the findings of fact are sustained by the evidence. When such is the case this court has held time and again that it will not disturb the lower court's findings. There are some slight deviations from the evidence but they do not constitute reversible error. Two examples of

**6**

Scale 1" = 1 mi.

error that the district lays great stress upon are as follows:

(a) Findings of Fact Nos. 8 and 9 are in error because the lower court found that "about 1941 work was begun * *" when the evidence shows that the first work was done in 1927-1928. This apparent error is meaningless for the reason that any work that was done along Lateral 5 by replacing the embankment to its original height of ·1½ feet at that time never caused any water to run over plaintiff's land. It was not until 1942 that the channel built by the District reached plaintiff's corner.

(b) The District complains in many of its assignments of error that the lower court used certain phrases to describe the conditions that existed, rather than the correct terminology such as "surface waters" instead of "flood waters," "drainage works" instead of "protective works," etc. While there may be some merit to the distinction between the terms, actually under the law of the case as hereinafter set out it makes no difference.

The District's first assignment of error is that the lower court lacked jurisdiction because plaintiff failed to file a verified claim as provided by Sec. 75-418, A.C.A.1939: "No claim shall be paid by the district treasurer until the same shall have been allowed by the board. * * * All claims against the district shall be verified in the same manner as is required for claims against counties."

Sections 17-316 to 17-321, A.C.A.1939, provide the manner and time in which such verified claims must be filed. A reading of these sections will clearly show that the taking of plaintiff's property by eminent domain is not such a claim as was contemplated by said sections. The requirement of filing such claim refers to contractual obligations and not to liabilities incurred by torts or under eminent domain. City of Phoenix v. Mayfield, 41 Ariz. 537, 20 P.2d 296. If the provision in Sec. 17-316 limited a claimant's right for loss of his property under eminent domain to a period of six months, it would run afoul of the general law governing the statute of limitations.

Sec. 17, Art. 2 of the Arizona Constitution is similar to the eminent domain provision of the State of Washington. Our court in Bugbee v. Superior Court, 34 Ariz. 38, 267 P. 420; Cienega Cattle Co. v. Atkins, 59 Ariz. 287, 126 P.2d 481; Ramirez v. Electrical Dist. No. 4, 37 Ariz. 360, 294 P. 614, has followed the construction placed thereon by the Washington Supreme Court. See: Wong Kee Jun v. City of Seattle, 143 Wash. 479, 255 P. 645, 52 A.L.R. 625; Kincaid v. Seattle, 74 Wash. 617, 134 P. 504, 135 P. 820; Willett v. Seattle, 96 Wash. 632, 165 P. 876; Boitano v. Snohomish County, 11 Wash. 2d 664, 120 P.2d 490.

We hold, therefore, that it was unnecessary for plaintiff to comply with said sections as a condition precedent to the filing

**8**

and prosecuting of this action against the District.

█ The District's third assignment of error is that plaintiff's action is barred by the one year statute of limitations, Sec. 29-201, A.C.A.1939, because plaintiff's claim is based "upon a liability created by statute." "A liability created by statute" is a liability that comes into being solely by statute, and one which had no existence prior to the enactment creating it. Griffen v. Cole, 60 Ariz. 83, 131 P.2d 989.

█ The question then arises whether or not Art. 2, Sec. 17, of the Arizona Constitution creates such a liability. While that section is not self-executing, In re Forsstrom, 44 Ariz. 472, 38 P.2d 878, it was primarily enacted, as its heading indicates: "Eminent Domain", for the benefit of the public. The right of property in the individual and to damages for its taking. or injury existed long prior to the adoption of our constitution and would exist today without the eminent domain provision. Where liability would exist in some form irrespective of the statute, it is not a liability created by statute. Griffen v. Cole, supra; Haws v. Fracarol, 9 Cir., 72 F.2d 461. This not being a liability created by statute the one year statute of limitations does not apply.

The constitutional provision on "Eminent Domain" gave the right to take private property, in a limited way for "private use" and in a broader and general way for "public use", provided payment is made.

If there were no eminent domain provision, private property could not be so taken. Therefore, private property rights existed prior to the enactment of that provision.

"A corporation possessing the right of eminent domain may acquire property for its public uses in one of three ways only: (a) By purchase; (b) by condemning and paying for the property in the manner provided by law; and (c) by adverse possession for the statutory period. If the right of the owner to recover compensation for property actually taken is barred before the expiration of the prescriptive period, this anomalous situation will result: He will continue to be the owner of the property until he loses his title by adverse possession, yet during the interval he cannot exercise a single act of beneficial ownership or do any act to toll the running of the statute. He will be deprived of the use and enjoyment of property which belongs to him, both in law and in equity, while the one who has taken it without title either legal or equitable can exercise over it every right ordinarily incident to ownership. We are unable to appreciate a condition where an owner is deprived of all right of enjoyment, while another who holds no sort of title to the property may use and deal with it as his own. Title cannot be invested where none has been divested. To hold otherwise is to sanction a custom belonging to an age long since passed, which permitted one to acquire property of another merely by taking

it provided he was strong enough to retain it." Aylmore v. City of Seattle, 100 Wash. 515, 171 P. 659, 660, L.R.A. 1918E, 127.

■ The eminent domain provision, while taking away some "private rights" in property, yet protects an existing right, i. e. the right to fair and just compensation for the use of or the taking of private property. We heretofore held "an easement for an irrigation ditch is property, and cannot be taken or damaged, even by the public, without payment therefor. Article 2, § 17, Constitution of Arizona." Beville v. Allen, 28 Ariz. 397, 237 P. 184. While the facts in that case are converse to the instant case, the same principle of law applies, to wit: the District cannot take or create an easement without payment therefor.

■ Plaintiff correctly contends that the ten year statute, Sec. 29-103, A.C.A.1939, applies. Plaintiff's complaint was filed February 12, 1947. The question is, then, when did the statute begin to run? The facts are slightly in dispute as to how much flood protective work was done by the District along Lateral 5 in the years 1940–1941. Prior to 1939 the District did practically nothing along Lateral 5 in the way of protective work except to replace the banks of the road and Lateral with dirt from the "borrow" pit alongside the road. In 1941 after the flood of 1939 the District began a definite plan to divert the waters of Trilby wash easterly along Lateral 5 instead of allowing them to go southerly in the natural bed of the stream. This diversion was done, not only to protect Lateral 5 from washing out, but also to protect Laterals 6 and 7, one and two miles respectively south, as well as the lands within the District between said laterals. In 1941 the District did the following: built 4 "rock baskets" which consisted of rock walls 2 to 3 feet thick by 20 feet long encased in wire fencing, to help divert the water easterly; extended the embankment along the north side of the west half of Sec. 8 in 1941 or early 1942; built an embankment on the south side of Sec. 5 to keep flood waters from backing up on this section in times of flood; cut a channel one mile easterly to the common corner of Secs. 5, 6, 7 and 8. In 1942 it extended this channel another mile east to the common corners of sections 4, 5, 8 and 9 which brought the channel to the northwest corner of plaintiff's property. Up to that time there was not any flood hazard to plaintiff's land, nor even a threat. In 1943 plaintiff's cotton "was bothered a little", but no serious damage occurred. The District continued work on its flood control project until September, 1947 at which time it built a large earthen dam near or over one rock basket on a radius that would further conduce the waters of Trilby wash to flow eastery toward plaintiff's land.

■ The method by which the District attempts to use and take this land must necessarily be by prescription, because the District has neither purchased nor con-

demned it under eminent domain. Aylmore v. City of Seattle, supra. This court has repeatedly held that an easement by prescription can only be gained by a continued and hostile use for a period of 10 years. Curtis v. Southern Pac. Co., 39 Ariz. 570, 8 P.2d 1078; Boyd v. Atchison, T. S. F. Ry. Co., 39 Ariz. 154, 4 P.2d 670; Gusheroski v. Lewis, 64 Ariz. 192, 167 P.2d 390; LaRue v. Kosich, 66 Ariz. 299, 187 P.2d 642.

Giving the District the most favorable view of the evidence, that the "use" or the "taking" began upon the completion of the channel to plaintiff's corner in 1942, rather than the first invasion of water in 1943, it is too clear for further comment that the action was not barred by the ten year statute, Sec. 29-103, A.C.A.1939.

This case is distinguishable from Boyd v. Atchison, T. S. F. Ry. Co., supra, regarding damages following the new owner because in the Boyd case the use of the easement was definite and complete, and in the case at bar there was no certainty the District would continue to flood the land. Defendant placed no permanent structures nor expended any sums of money on plaintiff's land. The flow of flood waters over raw, brush covered desert land will do little damage, but such a flow over the same land planted to crops will render the land useless, or partially so. Furthermore, that case has no application because plaintiff was the owner of the land before any prescriptive right for an easement commenced to run.

No amount of delay short of the prescriptive period of 10 years will defeat appellee's action for compensation. 30 C.J. S., Eminent Domain, § 415, page 142. In the case of United States v. Dickinson, 4 Cir., 152 F.2d 865, affirmed 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789, the court held the cause of action began upon the flooding of the lands and not the building of the dam.

The District's fifth assignment of error is that Art. 13, Sec. 7 of the Arizona Constitution, "Irrigation, power, electrical, agricultural improvement, drainage and flood control districts, and tax levying public improvement districts, now or hereafter organized pursuant to law, shall be political subdivisions of the state, and vested with all the rights, privileges and benefits, and entitled to the immunities and exemptions granted municipalities and political subdivisions under this Constitution or any law of the state or of the United States; but all such districts shall be exempt from the provisions of sections 7 and 8 of Article 9 of this constitution", is a bar to this action. Counsel have cited no authority, nor did they argue this proposition in their brief. This assignment is without merit.

The District's sixth and seventh assignments of error are that it is immune from liability, and therefore it is a case of dam-

num absque injuria. These, like No. 5 are without merit.

The District maintains that this court fell into error when it laid down this rule: "A land owner has no right to collect surface water in an artificial channel and discharge it in large quantities upon the land of a lower owner to his damage", Roosevelt Irr. Dist. v. Beardsley Land and Inv. Co., 36 Ariz. 65, 282 P. 937, 939; Maricopa County Municipal Water Conservation Dist. No. 1 v. Roosevelt Irr. Dist., 39 Ariz. 357, 6 P.2d 898; first, because the decisions in those cases did not take into consideration Sec. 75-311, A.C.A. 1939: "Irrigation districts organized under this article shall have the right to construct, maintain, and keep in repair levees for the protection of the lands embraced therein from overflow, and all the provisions of this article relating to the construction, maintenance and repair of irrigation works, the issuance of bonds and the levying of assessments therefor shall be applicable to the construction, maintenance and repair of such levees", and secondly, that at the time those decisions were written, Art. 13, Sec. 7, Arizona Constitution, designating such district a political subdivision, had not yet been adopted. We fail to see how the consideration of either one of these provisions would alter the case. The state itself would not be immune from suit, hence no such immunity could extend to the District, one of its political subdivisions. True, that section and provision gave the District certain rights but did not relieve it from responding in damages for payment to the persons whose property it uses or takes.

Regarding the taking of property by eminent domain we heretofore said in In re Forsstrom, supra [44 Ariz. 472, 38 P.2d 882]: "It would follow from these definitions and explanations of the meaning of the term 'property' that since it consists, not in tangible things themselves, but in certain rights in and appurtenant to them, it would logically follow that, when a person is deprived of any of these rights, he is to that extent deprived of his property, and that it is taken in the true sense, although his title and possession of the physical object remains undisturbed. Any substantial interference, therefore with the rights over a physical object which destroys or lessens its value, or by which the use and enjoyment thereof by its owner is in any substantial degree abridged or destroyed, is both in law and in fact a 'taking' of property. It is apparently only of recent years that the meaning of the word 'taking,' when used in regard to eminent domain, has been properly understood by the majority of the courts, although it would seem obvious that a careful analysis of the true nature of 'property' would have shown it long since."

The fact that plaintiff still has his property is no satisfaction for the damages that he has suffered. A taking of any kind or an infringement on the use of his

property that would diminish its value in whole or in part is a loss for which he should be compensated.

In a recent case we held a condemnation statute to be unconstitutional since it did not provide for full compensation for property taken under eminent domain, Art. 2, Sec. 17, Arizona Constitution. Arizona Corporation Commission v. Tucson Gas, Electric Light & Power Co., 67 Ariz. 12, 189 P.2d 907.

Appellant further raises the proposition that the court in the Roosevelt Irrigation cases, supra, was dealing with "surface waters", while in this case the parties are admittedly dealing with "flood waters". It is interesting to note that the District in those two cases was the defendant as here. There, it diverted the surface waters from the water shed of the White Tank Mountains away from its main canal before the water entered its district. Here it diverted the waters of Trilby wash, made up of surface waters originating from the water shed of the same mountains, as well as the Wickenburg and Hieroglyphic Mountains, after the wash entered into the District.

Flood waters are precisely defined in Southern Pac. Co. v. Proebstel, 61 Ariz. 412, 150 P.2d 81, 83:

"Flood waters are thus correctly described in 26 Cal.Jur. 280, supra:

" 'Flood waters are distinguished from surface waters by the fact that the former have broken away from a stream, while the latter have not yet become part of a watercourse. The term "flood waters" is used to indicate waters which escape from a watercourse in great volume and flow over adjoining lands in no regular channel, though the fact that such errant waters make for themselves a temporary channel or follow some natural channel, gully or depression does not affect their character as flood waters or give to the course which they follow the character of a natural watercourse.'

"It is thoroughly settled that flood waters escaping from a stream are not surface waters and do not lose their character as flood waters while flowing wild over the country. In Horton v. Goodenough, 184 Cal. 451, 194 P. 34, 37, it was said:

" ' * * * The waters are plainly flood waters breaking out of their channel and running wild, and as such each property owner threatened has the right to protect himself against them as best he can, under the authority of the decisions we have already cited, the most notable of which is Lamb v. Reclamation District No. 108, supra, 73 Cal. 125, 126, 14 P. 625, 2 Am. St.Rep. 775. The waters are not surface waters in the technical sense, for they have already been gathered into a stream whence they have escaped.'

"A similar rule is announced in LeBrun v. Richards, 210 Cal. 308, 291 P. 825, 828, 72 A.L.R. 336, with the added remark that 'flood waters are those which escape from

a stream or other body of water and overflow the adjacent territory.' "

■ It is easily seen that the waters in this case were called flood waters by the parties because they came in flood proportions, but were not "flood waters" when the District diverted them from Trilby wash by an artificial channel that ended two miles east of the wash. There is no evidence in the case that the waters ever overflowed the banks of Trilby wash, their natural bed. The evidence is that the water was conveyed through the District's diversion channel, and was then cast upon plaintiff's land, which is the logical thing to expect when a channel abruptly stops in the middle of the desert. The waters were first "surface waters"; after entering the natural bed of Trilby wash they became "stream waters"; and when the District built a channel to carry off these waters and they overflowed the end of the channel, they then became "flood waters". The District seeks protection under the decision in the Proebstel case in that it is permitted like the defendant in that case to protect itself against flood waters. Had the District built embankments along Trilby wash to prevent the wash from overflowing and running wild over its lands when Trilby reached flood proportions, it would have been within its rights, even though the accumulated waters in the wash damaged a lower owner.

In the Proebstel case we said: "In comparing the foregoing cases it must be kept in mind that in the case before us the water which reached the lands of the plaintiff was not conducted there through artificial means, nor was the water discharged immediately upon her premises by the defendant but reached her lands in the bed of a natural watercourse."

In the instant case the reverse is true. The water which reached plaintiff's lands was conducted there by artificial means from the bed of a natural water course at the instance of the District.

■ Four assignments of error deal with the proposition that the court erred in applying the measure of damages. The lower court gave plaintiff judgment for the sum of $20,000 for the depreciation of the whole tract of land and $3,900 for damages to his 1947 crop. The rule generally stated is that the measure of damages is the depreciation in the market value of the whole tract. Hercules Water Co. v. Fernandez, 5 Cal.App. 726, 91 P. 401; Farmers' Reservoir & Irr. Co. v. Cooper, 54 Colo. 402, 130 P. 1004. In Clausen v. Salt River Valley Water Users' Ass'n, Ariz., 123 P.2d 172, 178, we said: "If the construction of the spillway had the effect of lessening the value of the land, it is just as much damaged, *to the extent its value is thereby reduced,* as it would be if the reduction in value had been caused by the water actually flowing upon it from the spillway." (Emphasis ours.)

Damage to crops is to be taken into consideration because they are a part of the

land. City of Tulsa v. Lloyd, 129 Okl. 27, 263 P. 152; United States v. First Nat. Bank, D.C., 250 F. 299; Ross v. Clark County, 185 Ark. 1, 45 S.W.2d 31; United States v. Klamath and Moadoc Tribes, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219. In this case the District offered no testimony on the question of damages. The trial court accepted the lowest figures submitted by the evidence, hence we see no reason to disturb the amounts assessed as damages by the court.

The judgment is affirmed.

UDALL, STANFORD and PHELPS, JJ., and DON T. UDALL, Superior Judge, concur.

LA PRADE, C. J., being ill, the Honorable DON T. UDALL, Judge of the Superior Court of Navajo County, was called to sit in his stead.