SAMUEL A. LIDDICK et al., Appellees, v. CITY OF COUNCIL BLUFFS et al., Appellees; SIMON SHYKEN et al., Interveners, Appellants; LOUISE ELBERT EVERETT et al., Interveners, Appellees.

No. 45817.

198

August 11, 1942.

Kimball, Peterson, Smith & Peterson, Ross, Everest, Geiser & Johnson, and Donald P. Baird, all of Council Bluffs, for interveners-appellants.

Hugh P. Finerty and Paul E. Robertson, both of Council Bluffs, for plaintiffs-appellees.

Proctor R. Perkins, of Council Bluffs, and Stipp, Perry, Bannister & Starzinger, of Des Moines, for the City of Council Bluffs and its officers, defendants-appellees.

C. H. Clark, Jr., of Ames, for the Iowa State Highway Commission and its members, defendants-appellees.

Daniel T. Sullivan, of Council Bluffs, for Louise Elbert Everett, intervener-appellee.

Ross, Everest, Geiser & Johnson, of Council Bluffs, for the Omaha & Council Bluffs Street Railway Company, intervener-appellee.

Wright & Kistle and Addison G. Kistle, all of Council Bluffs, for Omaha & Council Bluffs Street Railway Bridge Company, intervener-appellee.

BLISS, J.—For brevity and clarity, the City of Council Bluffs and its defending officers, and the Iowa State Highway Commission and its defending members, will be referred to, respectively, as the "City," and as the "Commission." This case was tried below, and comes to this court, by somewhat irregular procedure. It was instituted by the plaintiffs and the defendants as a "test" case. While it was alleged in the petition, and admitted in the answers, that the viaduct will be constructed unless the defendants are enjoined, it appears from the record that these allegations were simply for the purpose of stating an issue, and that the defendants did not and do not intend to build the viaduct if this court determines that the abutting owners are entitled to compensation for the taking of their property or to damages for its injury. While they seek a ruling of this court in the nature of an advisory opinion, yet the question for determination is not exactly moot or abstract, and its answer is necessary for the disposition of an actual pending controversy and concerns a matter of public importance, the settlement of which is desired by all parties to the suit. The entrance of the interveners into the case has made it one of a real adversary nature, and the judgment and decree of this court will be a final adjudication of the rights of the parties. 1 C. J. S., Actions, 1012 et seq., sections 17, 18.

The construction of the viaduct has not been started. The only questions involved are those of law, and the one which we are asked to determine is whether the City is liable to the owners of property abutting on the street, at the location of the viaduct, for compensation for the taking of their property, or for damages for its injury, growing out of the construction of the viaduct.

The defendants contend that even though the viaduct would permanently injure the property by impairing its use and depreciating its value, since the structure will be for a public purpose and wholly within the street lines and will not directly and actually invade or encroach upon the tangible abutting

property itself, there will be no "taking" of the property for a public use in the constitutional sense, requiring just compensation, and that any damages sustained will not be "legal" damages, but will be consequential damages, or damages for which there can never be any recovery, since they were presumably paid for or waived when the land for the highway was condemned, purchased, or dedicated.

█ The abutting property owners, however, insist that the viaduct will destroy or seriously interfere with their rights of access to and from their property, and to the passage of light and air thereto, and that these rights are valuable, and are their "private property," which they have never parted with in any way, or for which they have never been compensated, and that the viaduct will effect a "taking" of these property rights in the constitutional sense, and that payment therefor should be made or secured before the property is taken. They also urge that the viaduct will effect a change in the established grade of the street, in conformity with which they improved their properties, and that such change will damage and diminish the value of their property, and that no alteration of the grade should be made until the damages are assessed and paid, in compliance with section 5953 et seq., Code of 1939.

We agree with the contentions of the abutting owners as above stated.

For 15 years or more before these proceedings were started, the building of this viaduct has been under consideration by the City and the Commission. In 1935 it was on the building program of the Commission, and was submitted to and was approved by the Federal Government, which was to make the funds available for construction costs, under an Act of Congress for the elimination of hazards to life at railway grade crossings, but which would furnish no money for the payment of compensation or damages to the owners of abutting property, or for right of way. F. R. White, chief engineer of the Commission, testified:

"Nothing was done about the proposed project at that time, because no provision had been made for taking care of any property damages and eventually the project was dropped

out of the program, and was not built because no provision had been made for the payment of damages to abutting property. The matter of damages was so important that we refused to go ahead with the project until damages had been taken care of in some way. * * * the Commission has no authority to pay damages where the improvement is constructed wholly within the limits of the existing right of way.''

At that time it was not within the contemplation of the Commission or of the City that abutting property owners were not entitled to compensation for any taking or impairment of their property.

In 1936, at a time when the proposed viaduct was planned to extend only from 9th Street on the east to 14th Street on the west, the City appointed three councilmen as a committee to make a complete investigation of all the property abutting on Broadway on the site of the viaduct. After making the investigation, and after collaboration with the appraisal board of the Council Bluffs Real Estate Board, they made a written report to the council. This report stated that the abutting property had a taxable value of $86,040; that the owners estimated the property damages to be $200,100; and that, in the opinion of the committee, ''a reasonable and adequate settlement'' could be made for approximately $91,450. This report was accepted and filed. The estimate did not include damages to tenants. One of the committee, who owned much property in the city, estimated the damages to property and business at $100,000 to $125,000.

Late in 1937, it was the thought of attorneys for the City that the viaduct might be constructed without paying damages to abutting property owners. The plan was and is that the cost of constructing the viaduct will be paid out of federal railroad-crossing funds, under an Act of Congress designed to eliminate hazards to life at railroad grade crossings. Broadway is an extension, within the city, of a number of much-traveled Iowa primary and United States roads. The Chicago & Northwestern Railroad Company tracks cross Broadway at right angles between 11th and 12th Streets, and the tracks of the Illinois Central Railroad Company cross in like manner at 13th Street.

The viaduct is not to be constructed by the railroad companies under the provisions of chapter 305 of the Iowa Code, under which damages to property must be paid, nor by the City under chapters 301, 317, or any other statutory authority. But the plan proposed is that the Highway Commission will design, supervise, and construct the viaduct, under Code sections 4626, 4626.2, 4755.21, 4755.23, 4755.25, 4755.27, and other sections. Under the construction procedure proposed, no funds are said to be available from the Federal Government or from the Commission to pay any compensation or damages to abutting owners for the taking or injuring of their property.

There has been much activity on the part of the City and its officers during the past several years. Committees have been appointed, resolutions have been adopted, lawyers hired, numerous trips have been made by these committees and city officials to Ames, Des Moines, Chicago, and Washington, for consultations with the Commission, railroad officers, and federal officers, all for the purpose of bringing about the construction of this viaduct, if it can be done without compensating abutting owners for injuries sustained. Resolutions were adopted by the City approving the tentative design and plan of construction, and authorizing the Commission to proceed. The "city plan commission" has approved and recommended the plans submitted to it as required by 1939 Code section 5829.10. The Commission has refused to proceed with the construction work until the matter of damages has been settled. The present plans have never been submitted to the U. S. Bureau of Public Roads, which has the final approval of the project. It has never been placed on the active list or program of the bureau, and the project has not reached the stage where the Commission can say that they propose to construct the project with money furnished by the United States Government.

The petition of the plaintiffs and the answers of the Commission and of the City were all filed at the same time, April 19, 1939. At the same time there was also filed a stipulation signed by the attorneys of the plaintiffs and defendants. It recited the fact that the suit, as made by these parties, involved the question of the power of the Commission to construct the viaduct without the payment of damages to abutting property

owners, and also the question of the liability of the City to pay these damages. It also recited that it was the desire of the signatories to prosecute the cause to a decision in the district court, and an appeal therefrom to this court as early as possible. No injunction, either temporary or permanent, was ever ordered or issued.

On July 10, 1939, a resolution was passed noting the commencement of the suit, and directing the city attorney to procure certificate of title as to all abutting property, and to notify in writing all owners of abutting property of the pendency of the suit, and that its decision might be binding upon each of them, and of their right to appear in the cause and protect their rights. Such notices were served in July and August 1939. They recited the filing of plaintiffs' petition "asking that the City of Council Bluffs be restrained and enjoined from constructing and maintaining a viaduct on Broadway Street between a point 137.4 feet west of the center line of 15th Street, to a point 148.8 feet east of the center line of 9th Street, * * *" The notice further recited that the plaintiffs sued on behalf of themselves "and all other persons similarly situated." The petition contained no such allegation. The notice also states *"that the City proposes to proceed with the making of the improvement without awarding damages to the owners of the properties abutting on said improvement."* (Italics are ours.)

The abutting property owners are 46 in number but only about 30 have appeared. The petitions of intervention are of such length that we may note only briefly their general tenor. They alleged the substance of the petition and answers, their ownership of abutting property, the character of the same, the substantial interference or destruction of access to the property, the failure to comply with constitutional and statutory proceedings in taking property under the power of eminent domain, the establishment of the street grade in 1880, the improving of their properties in conformity to this grade, the change in the grade which will be effected by the viaduct, the lack of authority to change the grade without liability for damages, the active participation of the City in the viaduct project, the failure of the defendants to offer a complete or definite plan or specifications of the project.

The plans for the construction of the viaduct are only preliminary. They are very general, very incomplete and indefinite. Protests were made to the council by the street railway company, whose tracks are laid on Broadway and turn off at about 13th Street at a point under the proposed viaduct. The plans do not show how this situation will be met, although engineers of the Commission testify that this is but a detail.

The railroad companies involved are not parties to the suit, but they have indicated they are not interested in land damages, as such, but were interested in ramps or approaches off the viaduct and down onto railroad property. If these are provided, they will waive damages. The plans make no provision for such ramps or approaches. No specifications of the structure have been prepared. The plans, however, are sufficiently specific to show the location of the viaduct, its general dimensions, outline, and parts. Its estimated cost will probably exceed $500,000. The east terminus of the structure commences · at the west line of 9th Street. Starting at the present street grade, there is an approach rising at a plus-6 per cent grade to the floor of the overhead section. This approach is 266 feet in length and consists of two concrete retaining walls on each side, 46 feet apart, outside measurement. The space between the walls is to be filled solidly with earth. The roadway on the approaches and on the overhead section is 42 feet wide. The overhead section is 1,760 feet long. The approach at the west end is 246 feet long, and is constructed the same as the east approach and terminates at street grade at the east line of 15th Street. This makes the over-all length of the structure 2,272 feet. Broadway is 80 feet wide between the property lines. As noted, the roadway is 42 feet wide. Along each side of the roadway on the overhead section is a sidewalk 5 feet wide for pedestrians. It overhangs the floor of the roadway, and is supported upon brackets. These sidewalks do not extend onto the approaches, but only between 10th Street and 14th Street, and are reached by stairways from the surface of the street below. The overhead section of the roadway is supported by 23 sets of concrete piers, resting on the street below. These sets vary in distances apart from 53 feet to two 115-foot spans over the railways. Each set contains three piers 36 inches square. The middle pier in each set is 14 feet

from each outside pier, leaving space for a roadway that wide between the middle pier and each outside pier. The clearance between the ground surface of the street and the under surface of the overhead roadway, between the inside abutments of the approaches and the nearest pier, is 13.6 feet. This clearance increases until it reaches 22 feet at the highest elevation of the overhead roadway. The upper surface of the roadway at this point is 30 feet above the ground below. Typical cross sections show a proposed vehicular lane, on the ground street level, 12 feet wide on each side of the approaches, with 5-foot sidewalks on each side of it, abutting the property, and between the approaches and under the overhang of the upper roadway and to its side are proposed vehicular lanes, each 15.6 feet wide, with abutting sidewalks 5 feet wide. The lanes and sidewalks are rightly referred to as "proposed," since they are so marked on the plans, and so referred to in the testimony.

Mr. F. R. White, "the executive official of the Highway Commission—similar to that of president of a corporation," testifying for defendants, said:

"I am not particularly interested in whether or not the viaduct proposed on Broadway eliminates a grade crossing or not. *That is a matter which the City of Council Bluffs can determine for itself, 'if and when and after or before the viaduct may be built.'*" (Italics are ours.)

Jack Boyne, city engineer of Council Bluffs, testifying for interveners, said:

"Exhibit 30 [prepared by the Highway Commission in 1938] does not show whether or not there was a grade crossing elimination either at the Illinois Central or the North Western tracks."

However, there is testimony by White and W. E. Jones, engineer of designs for the Commission, that the Commission proposes these lanes of travel at street grade, and the attorneys for the City of Council Bluffs argue to us that if the improvement is made these lanes and sidewalks at street grade will remain.

However, we are deciding this case upon the factual assump-

tion that this project includes all of the proposed vehicular roadways and sidewalks on the ground level of the street, as above stated, and that there will be no elimination of the grade crossings.

To determine at this time, before the proposed and tentative plans have come to fruition, the full extent of the damages which may be sustained, is not possible, but they are sufficient to indicate to us that there is no question that the construction of this improvement will very substantially interfere with ingress to and egress from the properties abutting on Broadway, between 9th Street and 15th Street, and will also substantially interfere with the passage of light and air to them. There is no question that the use of the property will be greatly impaired and its value on the market substantially reduced. The damage and the interference to some will be greater than to others. The location of the viaduct is not far removed from the center of the business district. There are substantial business and residence properties abutting on Broadway at the location in question.

I. The grade of Broadway was established, as required by law, in 1880. There is no claim made that the lots of the abutters were not improved in accordance with this grade.

Section 5953 of the 1939 Code is:

"When any city or town shall have established the grade of any street or alley, and any person shall have made improvements on the same, or lots abutting thereon, according to the established grade thereof, and such grade shall thereafter be altered in such a manner as to damage, injure, or diminish the value of such property so improved, said city or town shall pay to the owner of such property the amount of such damage or injury."

The defending appellees offer two answers to the claim of the appellants that they are entitled to damages because of the change in the established grade. First, they say the City has not participated, and is not now participating in this suit, and therefore will not have anything to do with, or be responsible for, any change of grade. This is but quibbling. It was because of this defense of the City and the Commission that we set out

herein a part of the activity of the City during the past several years in an attempt to procure this viaduct. The record fully establishes that the City has been the chief and most persistent proponent of the viaduct project.

In Boal v. City of Chicago, 301 Ill. App. 536, 549, 23 N. E. 2d 237, 243, an action for damages to abutting property in which $8,500 was recovered, the court said:

"Where a city makes an improvement for its own benefit, it is liable for just compensation for the property damaged thereby by change of street grades and the building of viaducts thereon, and the plaintiffs suggest and this court agrees that where the city authorizes a structure upon a public street, which structure causes injury to adjacent property, it will be liable for all the damages resulting, precisely as though it had erected the structure itself."

The statute does not limit the liability to the one actually changing the grade. It appears to us that the statute places an affirmative duty on the City to see that the grade is not changed unless the provisions of the statute are complied with, and that if the City authorizes the alteration, as it has clearly done in this case, it is liable for the statutory damages. It cannot escape merely by *saying* it is not participating. The legislature has empowered the Highway Commission to aid in the construction of such a viaduct, but it has not said that it may do this without liability for property taken or damaged. There is no merit in this defense of the City and the Commission.

■    Second, they urge that the viaduct will not effect, or be, any change in the established grade.

The trial court, in its decree, stated:

"Furthermore the proposed viaduct will create no legal alteration of grade. It might be termed a supplemental grade. Nevertheless the old grade will still exist."

We are not clear as to what the court meant by saying the "viaduct will create no legal alteration of grade." Whether the alteration is legal is not as important as whether it will effect an alteration, in fact. It is no doubt a "supplemental grade," a second grade superimposed upon the surface grade,

and making an additional servitude upon the road as originally established, and materially interfering with the abutter's easements of access, light, air, and view. The old grade will *not* "still exist." Under the overhead section there will be 63 concrete pillars, 3 feet square, rising from the old pavement. The east approach will extend from the surface of the present street at an incline of almost 7 per cent, almost a block, to a height of 15 feet at the inside abutment of the approach. It will be solid concrete and earth, and will occupy 22,236 square feet of the existing street. A similar but slightly shorter approach will occupy the existing street at the west end of the viaduct. It cannot be said that the present street and the present grade of the street will not be materially and extensively changed by these approaches. The overhead section will be a new roadway and a new grade 1,760 feet long, 52 feet 2 inches wide, and 30 feet above the present street level. The city engineer testified that the construction of the viaduct would require a change in grade elevation. The engineers for the Commission did not testify on this point.

We have found in almost every viaduct case involving a structure such as the proposed one, that it was held that the viaduct was a change of grade. Such was the holding in Willis v. City of Winona, 59 Minn. 27, 60 N. W. 814, 26 L. R. A. 142; Selden v. City of Jacksonville, 28 Fla. 558, 10 So. 457, 14 L. R. A. 370, 29 Am. St. Rep. 278; Colclough v. City of Milwaukee, 92 Wis. 182, 65 N. W. 1039; Benton & Holden v. Central R. Co., 126 N. J. L. 340, 19 A. 2d 672; Hill-Behan Lbr. Co. v. State Highway Comm., 347 Mo. 671, 148 S. W. 2d 499; S. B. Penick & Co. v. New York Cent. R. Co., 3 Cir., N. J., 111 F. 2d 1006; 18 Am. Jur., Eminent Domain, 931, section 291; Ralph v. Hazen, 68 App. D. C. 55, 93 F. 2d 68; Accomac Realty Co. v. City of St. Louis, 347 Mo. 1224, 152 S. W. 2d 100; Campbell v. Arkansas State Highway Comm., 183 Ark. 780, 38 S. W. 2d 753; 3 Dillon, Mun. Corp., 5th Ed., section 1159; Crane v. Hahlo, 258 U. S. 142, 42 S. Ct. 214, 66 L. Ed. 514; Sauer v. City of New York, 90 App. Div. 36, 85 N. Y. S. 636, 180 N. Y. 27, 72 N. E. 579, 70 L. R. A. 717, affirmed, 206 U. S. 536, 27 S. Ct. 686, 51 L. Ed. 1176.

In the Sauer case, supra, much litigated in the courts of

New York on different phases of this case, twice before the United States Supreme Court, and much relied upon by appellees herein, a viaduct much like the one here proposed, with the old street left undisturbed except by the iron supporting piers and stairways, and except that it spanned a natural depression in the contour of the street rather than artificial obstructions and hazards, the courts in all of the cases referred to the viaduct as a change of grade. The viaduct involved in those cases was completed in 1893. Sauer owned and operated a casino at the intersection of 8th Avenue and 155th Street. The viaduct extended east from St. Nicholas Place, on top of a bluff at the end of 155th Street, and 70 feet above it, across a ravine to McComb's Dam Bridge over the Harlem River. The roadway of the viaduct was about 50 feet above Sauer's place. He began his litigation after the construction of the viaduct, and his estate finally recovered damages of $42,500 over 20 years later. His claim was based upon interference with his rights of access, air, light, and view. In one of the actions brought by his administratrix, People ex rel. Crane v. Ormond, 221 N. Y. 283, 287, 116 N. E. 993, the only question tried was whether the viaduct above described was a change in the grade of the street below on which Sauer's property abutted. By section 873, chapter 410, Laws of 1882, it was made the duty of the assessors, where the established grade of any streets north of 62d Street " 'shall be changed or altered in whole or in part' to estimate the damages suffered by abutting owners and to make an award therefor." In an opinion by Andrews, J., concurred in by Cardozo, J., and others, the court said:

"The serious question in the case is whether the structure in One Hundred and Fifty-fifth street changed the grade of the street within the meaning of the acts of 1882 and 1916. Wholly independent of the authorities upon the subject we are of the opinion that it did. It is true that the original surface of the street was not altered except by the erection of pillars. It is true that pedestrians and vehicles may still pass over it. But practically and substantially One Hundred and Fifty-fifth street as now used passes on a level fifty feet or more above the Sauer property. This is the level adopted by travel east and

west. To the street so used access was denied to Mr. Sauer. * * *
Under such circumstances the court should be slow to adopt a
technical construction of a phrase the result of which would
be to deprive the relator of any remedy. We also think that we
are concluded upon this question. It is true that in the various
cases brought by Mr. Sauer the courts of this state have never
said definitely that the structure constituted a change of grade.
The first reference to the subject is in 44 App. Div. 307 [60
N. Y. Supp. 649]. Justice McLaughlin speaking of the viaduct
says: It 'was something more than a mere change of grade of
the street.' In the second case Justice Laughlin (90 App.
Div. [36], 39 [85 N. Y. Supp. 636]) speaks of it as a double
roadway above and below. On appeal this court suggested (180
N. Y. 30 [72 N. E. 579, 70 L. R. A. 717]) that Mr. Sauer might
have relief under existing statutes—referring necessarily to
grade damages; notwithstanding that Judge Bartlett in a dis-
senting opinion had argued that there was no change of grade.
But this second case was appealed to the United States Supreme
Court. Upon that appeal (206 U. S. 536 [27 Sup. Ct. 686, 51
L. Ed. 1176]) Justice Moody evidently thought that a change
of grade had been effected. He says that the state courts have
uniformly held that the erection of such a viaduct 'is a legitimate
street improvement equivalent to a change of grade; and that,
as in the case of a change of grade,' the abutting owner is not
entitled to compensation. But he also quotes Willis v. Winona
City (59 Minn. 27) [60 N. W. 814, 26 L. R. A. 142], where,
speaking of a similar structure, the court says that it 'in effect
amounts merely to raising the grade' of the street; and that
it makes 'no difference in principle whether this was done by
filling up the street solidly or * * * by supporting the way on
stone or iron columns.' Shortly after the Sauer case was in
this court Judge O'Brien refers to it and interprets what we
intended to hold. In [Smith v. Boston & Albany R. Co.] 181
N. Y. 137 [73 N. E. 679], he says that at common law there was
no liability for the change of grade of a street. It is sufficient
as an authority to refer to the Sauer case. 'It was held in
that case that where the original street was elevated upon columns
fifty feet above the original surface that it was a change in the
grade of the streets within the meaning of the principle just

referred to.' Later Justice Scott, referring also to the Sauer case, says that this viaduct 'was held in every court to constitute a change of grade.' (People ex rel. City of New York v. Hennessy, 157 App. Div. 788) [142 N. Y. Supp. 841]. This case was affirmed here in 210 N. Y. 617 [104 N. E. 1137], without opinion, but no criticism was made of this statement. In view of this history we do not think that additional authority * * * is needed. But if it were the Hennessy case supports our conclusion. * * * Our holding is that such a structure as was erected in One Hundred and Fifty-fifth street constitutes a change of the grade.''

In most of the cases cited above there were no statutes allowing recovery of damages for changes in the established grade of a street. It was largely for that reason that no recoveries were allowed.

At common law it was generally held that a city or town was not liable to abutting owners for consequential damages suffered by either the establishing or the changing of a street grade, where the work was authorized and properly done. This was the holding of our earlier cases. Creal v. City of Keokuk, 4 (G. Greene) Iowa 47, 52; Cole v. City of Muscatine, 14 Iowa 296; Cotes & Patchin v. City of Davenport, 9 Iowa 227; Reilly v. Fort Dodge, 118 Iowa 633, 635, 92 N. W. 887; Russell v. City of Burlington, 30 Iowa 262. In the Creal case, supra, the court followed with great reluctance this ''unjust doctrine,'' supported by the weight of authority, and stated that:

''* * * there seems to be an unreasonableness and an apparent injustice in permitting a city after she has fixed the grade, and invited persons to build to it as fixed, to re-grade greatly to the damage of those who have been governed by it, without requiring the city to pay such damage. * * * But it is lamentably true that in nearly every state in the Union, where this question has been adjudicated, there seems to be no distinction upon the question of damages between grading and re-grading. * * * We find no case strictly in point opposed to these numerous authorities except those referred to by counsel for appellant found in the Ohio reports. They stand almost or quite alone, *and although we believe them right according*

*to our views of justice,* still they are not sustained by British or American authorities.'' (Italics supplied.)

Of these English cases and the American cases which follow them, Lewis, one of the ablest writers on the subject, in his treatise on the ''Law of Eminent Domain,'' Volume 1, 3d Ed., section 130, said:

''The English cases to which we have referred have been much cited in America to show that the owner of property damaged by works of a public nature, such as a change of grade, cannot recover compensation for such damage. But it is evident that they have no proper application in such cases. In England, as we have said, an act of parliament is the supreme law of the land. Courts cannot declare that wrong which an act of parliament has made lawful. * * * And, in case of damages caused by public works, it is necessary in this country to inquire, not only whether the works are authorized by law and have been carefully executed, but also whether the damage amounts to a taking of property within the meaning of the constitution. In solving this last question the English cases afford us no aid, or practically none. This distinction is frequently lost sight of, and we wish to insist upon it here, once for all.''

As the author notes, the distinction is clearly pointed out by the Supreme Court of Ohio, in Crawford v. Village of Delaware, 7 Ohio St. 459, 466.

The injustice complained about in Creal v. City of Keokuk, supra, was removed by chapter 40 of the [General and Public] Acts of the Fourteenth General Assembly (section 469, Code, 1873), which allowed damages sustained by the change of an established grade. This court has, on many occasions, upheld this statutory right to damages. Meyer v. Burlington, 52 Iowa 560, 3 N. W. 558; Richardson v. Sioux City, 136 Iowa 436, 439, 113 N. W. 928; Chiesa & Co. v. City of Des Moines, 158 Iowa 343, 345, 138 N. W. 922, 48 L. R. A., N. S., 899. It is true that the right to recover damages is purely statutory and is not a ''taking'' under the constitution, and the damages may be reduced by the benefits, but in the case before

us there is no evidence that any benefits will accrue to the abutting owners from the viaduct. It is our conclusion that the trial court was in error in holding that the viaduct, as proposed, will effect no change of the established grade of Broadway, and in holding that no damages are recoverable by the abutting owners which they may sustain from the viaduct, if and when it is constructed, because it effects a change in the grade. Of course, damages caused by any change in an established grade, to be recoverable must be of material consequence. To warrant a recovery there must be something more than inconvenience or slight damage.

II. The dissatisfaction of the courts, noted in the preceding division, with those decisions holding that injury to abutting property caused by altering an established street grade is damnum absque injuria, has been just as insistent and equally or better founded with respect to the decisions of many courts that the rights of ingress to and egress from abutting property, and the right to the free circulation of air and passage of light to said property, may be destroyed or substantially interfered with by the construction of viaducts or other improvements within the lines of the highway, without any liability therefor. The grounds advanced for these decisions are, that while such destruction and impairment of these rights may be a substantial damage to the property, it is not a direct invasion or appropriation of the corpus of the property, and is only consequential, and therefore there is no "taking" of the property, in the language of the constitutions, for which just compensation is required. These courts also urge that if there is any "taking," it was within the contemplation of the interested parties at the time of the condemning, deeding, or dedication of the land for the highway, and compensation was either waived or paid for, in contemplation of law.

Section 18 of Article I of the Iowa Constitution has to do with eminent domain, and states:

"Private property shall not be taken for public use without just compensation first being made, or secured to be made to the owner thereof, as soon as the damages shall be assessed by a jury, who shall not take into consideration any advantages

that may result to said owner on account of the improvement for which it is taken."

There is a similar provision in the Constitution of the United States [fifth amendment]. In the earlier days there was little controversy over these provisions, but as land became more valuable and its value was enhanced by improvements, and the public servitude on the highways increased with the increase of population and the growth of cities and towns, considerable controversy arose as to the meaning of the words "taking" and "property." Since the power of eminent domain is an inherent and inseparable attribute of sovereignty which existed prior to constitutions, the constitutional provisions are not grants of the power, but are limitations upon its exercise. 4 McQuillin, Mun. Corp., 2d Ed., section 1570; Smith v. Arkansas Irrigation Co., 200 Ark. 1022, 142 S. W. 2d 509; Rose v. State, 19 Cal. 2d 713, 105 P. 2d 302; Botts v. Southeastern Pipe-line Co., 190 Ga. 689, 10 S. E. 2d 375; Ryan v. Housing Authority of Newark, 125 N. J. L. 336, 15 A. 2d 647; Bronx Chamber of Commerce v. Fullen, 174 Misc. 524, 21 N. Y. S. 2d 474; 1 Lewis, Eminent Domain, 3d Ed., section 10.

These provisions are for the protection of the individual against the excesses of the government with respect to his property, and should be broadly and liberally interpreted to effect that purpose. When the question arose as to what was meant by these limitations it was construed as expressing the intention of those who made, or adopted, the constitutions, to include therein compensation, not only for the property directly appropriated, but also damages to the property remaining in the owner.

"The general feeling that uncompensated injury to private lands from public improvements constituted a gross injustice was doubtless what gave favor to the doctrine adopted by some courts, that the terms 'taken' and 'damaged' were synonymous; and the feeling became so pronounced in some states in which legislatures were thought likely to be unmindful of private rights, that constitutional amendments were adopted to the effect that property should not be damaged or injured for the

public use without compensation." 18 Am Jur., Eminent Domain, 762, 763, section 136.

The matter was very important, and to avoid any question about it the Illinois Constitution was amended in 1870 by adding to the word "taken," in the eminent-domain provision, the words "or damaged." Many other states thereafter amended their constitutions in like manner. As some indication that the provision was sufficiently broad to include damages without the amendment, the Illinois court, in City of Pekin v. Brereton, 67 Ill. 477, 480, 16 Am. Rep. 629, 631, said:

" * * * the constitution of 1870 * * * provides in the 'Bill of Rights,' section 13 of the second article, that 'private property should not be taken *or damaged* for public use without just compensation.' It will not be denied this provision rests upon a great principle of right and justice which would, doubtless, be applied by courts in every proper case *without constitutional sanction.*" (Italics are ours.)

Chief Justice Shaw of Massachusetts, one of the really great judges of this country, speaking for the court in Old Colony & Fall River R. Co. v. Inhabitants of the County of Plymouth, Mass., 14 Gray 155, 161, said:

"The word 'property' in the tenth article of the Bill of Rights, which provides that 'whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor,' should have such a liberal construction as to include every valuable interest which can be enjoyed as property and recognized as such."

In State v. Superior Court, 26 Wash. 278, 286, 66 P. 385, 388, that court, in speaking of the word "property," said:

"It is used in the constitution in a comprehensive and unlimited sense, and so it must be construed. * * * It need not be any physical or tangible property which is subjected to a tangible invasion. The right to the use and possession of a lot abutting on to a public street is property. The right to light and air and access is equally property. * * * the modern au-

thorities are uniform that these are rights which are guaranteed by constitutional provisions similar to ours.''

The Michigan court in Pearsall v. Board of Supervisors, 74 Mich. 558, 561, 42 N. W. 77, said:

''The constitutional provision is adopted for the protection of and security to the rights of the individual as against the government, and the term 'taking' should not be used in an unreasonable or narrow sense.''

In 1 Lewis, Eminent Domain, 3d Ed., section 63, the author, in answer to what ''property really is,'' says: ''The term is applied with many different meanings. 'Sometimes,' says Austin, [2 Jurisprudence, section 1051], 'it is taken in the loose and vulgar acceptation to denote not the right of property or *dominium*, but the subject of such a right; as where a horse or piece of land is called my property.' A little reflection, however, will suffice to convince any one that property is not the corporeal thing itself of which it is predicated, but certain rights in or over the thing. * * * We must, therefore, look beyond the thing itself, beyond the mere corporeal object, for the true idea of property. Property may be defined as certain rights in things which pertain to persons and which are created and sanctioned by law. These rights are the right of user, the right of exclusion and the right of disposition.'' After mentioning the rights of lateral support, access, light, air, flowing water, etc., the author, referring to them, says: ''These rights, wherever they exist, and to the extent to which they are secured by law, are part and parcel of the owner's property in land.'' (Section 63.) Continuing in section 64, the author states: ''Having indicated the true meaning of the word property, it remains to inquire what meaning it has in the constitution. Undoubtedly, in such an instrument, it should be given a meaning that accords with the ordinary usage and understanding of * * * the large body of citizens who gave it vitality by their votes. * * * What did they mean by property? The dullest individual among the people knows and understands that his property in anything is a bundle of rights. * * * Now it seems to us that the word property in the constitution should be given a meaning which, while in accord with the sense in which it is practically used

and understood by the people, will also secure to the individual the largest degree of protection against the exercise of the power intended to be restricted."

Sedgwick in his work on Constitutional Law, 2d Ed., 462, 463, states:

"I cannot refrain from the expression of the opinion, that this limitation of the term *taking* to the actual physical appropriation of property or a divesting of the title is, it seems to me, far too narrow a construction to answer the purposes of justice, or to meet the demands of an equal administration of the great powers of government. The tendency under our system is too often to sacrifice the individual to the community; and it seems very difficult in reason to show why the State should not pay for property of which it destroys or impairs the value, as well as for what it physically takes. If by reason of a consequential damage the value of real estate is positively diminished, it does not appear arduous to prove that in point of fact the owner is deprived of property, though a particular piece of property may not be actually taken."

The same thought is expressed by 4 McQuillin, Municipal Corporations, 2d Ed., section 1576, as follows:

"In considering the constitutional provision forbidding the taking or damage of private 'property' for public use without compensation, it is necessary to determine what is 'property.' Formerly the tendency was to confine the meaning of the word to the tangible thing itself. At present, however, it is generally held that private property forbidden to be taken or damaged by the constitution for the public use without just compensation is not limited to the tangible subject-matter or corpus of the property, but includes the right of user and enjoyment of it, so that when such rights are destroyed or taken for public use, the owner thereof is entitled to compensation."

In keeping with the tendency as noted above by the text writers, we find it is the present holding of the great majority of the courts that property, in law, does not mean the material thing or physical object itself, but certain rights and powers over, and interests in, the object or thing, including the rights

of possession, use, and disposition of it. Some of these later cases are, In re Forsstrom, 44 Ariz. 472, 38 P. 2d 878; Smith v. Erie R. Co., 134 Ohio St. 135, 16 N. E. 2d 310; Tatum Bros. Real Estate & Inv. Co. v. Watson, 92 Fla. 278, 109 So. 623; Meek v. State, 205 Ind. 102, 185 N. E. 899; McInnes v. McKay, 127 Maine 110, 141 A. 699; Boothby v. City of Westbrook, Maine, 23 A. 2d 316; Pernell v. City of Henderson, 220 N. C. 79, 16 S. E. 2d 449; Gasque v. Town of Conway, 194 S. C. 15, 8 S. E. 2d 871.

A further statement in section 65 of 1 Lewis, Eminent Domain, 3d Ed., is:

"If property, then, consists, not in tangible things themselves, but in certain rights in and appurtenant to those things, it follows that, when a person is deprived of any of those rights, he is to that extent deprived of his property, and hence, that his property may be taken, in the constitutional sense, though his title and possession remain undisturbed; and it may be laid down as a general proposition, based upon the nature of property itself, that, whenever the lawful rights of an individual to the possession, use or enjoyment of his land are in any degree abridged or destroyed by reason of the exercise of the power of eminent domain, his property is, pro tanto, taken, and he is entitled to compensation."

It is uniformly recognized that an owner of property abutting on a street has every right in the street that any member of the public has, and in addition, by reason of his location, certain special rights, to wit, the right of ingress and egress, and the right to light, air, and view. In 3 Dillon, Mun. Corp., 5th Ed., section 1123, these rights are thus stated:

"The full conception of the true nature of a public street in a city, as respects the rights of the public on the one hand, and the rights of the adjoining owner on the other, has been slowly evolved from experience. It has been only at a recent period in our legal history that these two distinct rights have, separately and in their relations to each other, come to be understood and defined with precision. The injustice to the abutting owner arising from the exercise of unrestrained legisla-

tive power over streets in cities was such that the abutter necessarily sought legal redress, and the discussions thence ensuing led to a more careful ascertainment of the nature of streets, and of the rights of the adjoining owner in respect thereof. It was seen that he had in common with the rest of the public a right of passage. But it was further seen that he had certain rights not shared by the public at large, special and peculiar to himself, and which arose out of the very relation of his lot to the street in front of it; and it has been held * * * that these rights, whether the bare fee of .the streets was in the lot-owner or in the city, were rights of property, and as such ought to be and were as sacred from legislative invasion as his right to the lot itself.''

Sound and pertinent comment, with Justice Miller speaking for the court, respecting the proper construction of the eminent-domain provision of the Federal Constitution, appears in Pumpelly v. Green Bay & Mississippi Canal Co., 13 Wall. 166, 177, 20 L. Ed. 557, 560. This was an action of trespass for damages caused by the backing up and overflow of water upon plaintiff's land, in the construction of a dam authorized by the state of Wisconsin and built in conformity to the specifications of the statute. Under the circumstances, the damages were directly caused by an actual invasion of plaintiff's property, but the statement of the court was provoked by the argument of defendant that the damages were but consequential. The court said:

''The argument of the defendant is that there is no taking of the land within the meaning of the constitutional provision, and that the damage is a consequential result of such use of a navigable stream as the government had a right to for the improvement of its navigation.

''It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to

change or control them, it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not taken for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors.''

See, also, some sound comment by the annotator in 11 L. R. A. 56.

This court has many times recognized these special property rights of the abutting owner, distinct and different from those of the general public. These special rights are property having a value as certainly as the tangible property itself, and increasing the worth of the latter. Long v. Wilson, 119 Iowa 267, 268, 269, 93 N. W. 282, 60 L. R. A. 720, 97 Am. St. Rep. 315; Borghart v. City of Cedar Rapids, 126 Iowa 313, 101 N. W. 1120, 68 L. R. A. 306; Ridgway v. City of Osceola, 139 Iowa 590, 117 N. W. 974; McCann v. Clarke County, 149 Iowa 13, 15, 16, 127 N. W. 1011, 36 L. R. A., N. S., 1115. See, also, McKinney v. Rowland, 197 Iowa 180, 185, 197 N. W. 88; Perry v. Castner, 124 Iowa 386, 392, 100 N. W. 84, 66 L. R. A. 160; 2 Ann. Cas. 363; Wendt v. Town of Akron, 161 Iowa 338, 343, 142 N. W. 1024; Bryan v. Petty, 162 Iowa 62, 64, 143 N. W. 987; Ritchhart v. Barton, 193 Iowa 271, 275, 186 N. W. 851; Hubbell v. City of Des Moines, 183 Iowa 715, 719, 167 N. W. 619; Hubbell v. City of Des Moines, 173 Iowa 55, 60, 154 N. W. 337; Furgason v. Woodbury County, 212 Iowa 814, 823, 237 N. W. 214; Wegner v. Kelley, 182 Iowa 259, 265, 165 N. W. 449; Western Newspaper Union v. City of Des Moines, 157 Iowa 685, 140 N. W. 367.

Keeping in mind that property is not alone the corporeal thing, but consists also in certain rights therein created and sanctioned by law, of which, with respect to land, the principal

ones are the right of user and enjoyment, right of exclusion, right of disposition, and lesser ones, included in the right of user and enjoyment, are rights to access, light, air, view, support of soil, to be protected from unreasonable uses of neighboring property, to be protected in the natural flow of water, it is clear that the corporeal thing is taken, that property is taken, pro tanto, when any one or more of these rights are taken, of which property consists. And when the right of access to and from the tangible, corporeal thing, by way of adjacent streets, is taken, thereby preventing the use and enjoyment of the tangible property, that tangible property, itself, is taken. Two old, but very instructive and well-considered cases on the matter are Eaton v. Boston, C. & M. R. R., 51 N. H. 504, 12 Am. Rep. 147, and Thompson v. Androscoggin River Imp. Co., 54 N. H. 545.

The Ohio court early recognized and adopted the rule that the destruction or material injury by a municipality of those special rights of the owner, appurtenant to his lands located upon the street or highway, was a taking of property entitling the owner to compensation. This court, in Cook v. City of Burlington, 30 Iowa 94, 102, 6 Am. Rep. 649, set out the holding of the Ohio court, as announced in its decisions, by quotation therefrom. In introducing the quotation, Justice Day, speaking for the court, said:

"The supreme court of Ohio, in the case of Street Railway v. Cummingsville, 14 Ohio 523, in an opinion which, for its ability, and the wise and just solution of the questions presented, commends itself to the professional and judicial mind, recognized the distinction between the right of the public to use the street, *and the right* and interest of the adjacent owners."

Preceding this comment, the court had referred to Warren v. Mayor of Lyons City, 22 Iowa 351, in which case the city officials had attempted to divert the use of a public square, and said:

"If, then, the interest of the lot owner in the square partakes so much of the nature of property, upon what principle of justice or reason shall he be denied the interposition of the

courts, for the purpose of protecting and preserving this interest?''

The Ohio court still maintains the position which it early took. See Occo Realty Co. v. New York, C. & St. L. R. Co., 33 Ohio App. 414, 169 N. E. 719; Smith v. Erie R. Co., 134 Ohio St. 135, 16 N. E. 2d 310.

In Long v. Wilson, supra, Justice Ladd, after referring to the case of Barr v. City of Oskaloosa, 45 Iowa 275, in which Justice Day spoke for the court, said at page 273 of 119 Iowa, page 284 of 93 N. W.:

''The writer of the opinion had spoken for the court in Cook v. City of Burlington, 30 Iowa, 94, and quoted with approval language from an Ohio case *which so clearly expresses our conclusion—that it will bear repetition*.'' (Italics ours.)

An excerpt from the quotation is then set out. Thus, again, did this court approve of the principle that an abutter's easement, or right of access, is a right of property, protected by the constitution, which cannot be taken from the owner without compensation. In Long v. Wilson, supra, the defendants had procured an adjudication against the city of Perry, narrowing the street between the property of Long and the defendants, to 13 feet. Plaintiff sued to prevent its being put into effect. In affirming a decree for plaintiff, the court said at page 269 of 119 Iowa, page 282 of 93 N. W.:

''It may not be of importance to the general public whether a particular street is vacated or not. It is important to the individual owner of abutting property that he shall be able to get to and from his residence or business, and that the public shall have the means of getting there for social or business purposes. In such a case access to thoroughfares connecting his property with other parts of the town or city has a value peculiar to him, apart from that shared in by citizens generally, and his right to the street as a means of enjoying the free and convenient use of his property has a value quite as certainly as the property itself. If this special right is of value,—and it is of value if it increases the worth of his abutting premises,—then it is property, regardless of the extent of such value. Surely no argument

is required to demonstrate that the deprivation of the use of property is to that extent the destruction of its value.

"Under the allegations of the petition, then, *shutting off the approach to plaintiff's homestead was the taking of his property,* and of this there has been no adjudication." (Italics ours.)

The court then quoted from Heinrich v. City of St. Louis, 125 Mo. 424, 28 S. W. 626, 46 Am. St. Rep. 490, as follows:

" 'This right of access is appurtenant to his lot, and is private property. To destroy that right is to damage his property, and when this is done for the public good the public must make just compensations.' "

In Borghart v. City of Cedar Rapids, supra, 126 Iowa 313, 101 N. W. 1120, the plaintiff sued to recover damages for the vacation of a public square, which afforded the only access to her abutting property. In affirming her judgment, the court, after discussing her right of access, said, pages 315 and 316 of the Iowa Report:

"That this latter right is private and personal and unshared by the community, and cannot be taken away without answering in damages, is held by substantially all the authorities. * * * As such destruction is presumed to have been for the public good, the public must make just compensation for the property to the extent taken."

In Ridgway v. City of Osceola, supra, at pages 593 and 595 of 139 Iowa, page 975 of 117 N. W., defendant had vacated a street and alley adjacent to plaintiff's property. In reversing judgment entered on a ruling sustaining a demurrer to plaintiff's petition claiming damages, the court quoted with approval from the Long and Borghart cases, supra, and from Elliott, on Roads and Streets, 1st Ed., 662, 663, and said:

"In these latter cases it is held that, where the street or alley is necessary to the free and convenient access to the premises of the particular owner, his right to such use is appurtenant to his premises, and cannot be taken away without the payment of damages. * * * Suffice it to say that a street or alley may become so appurtenant to abutting property that it cannot be

vacated without paying compensation to the owner of that property.''

McCann v. Clarke County, supra, was a successful suit to recover damages for the vacation of adjacent country highways. In affirming, and after citing with approval the Long, Borghart, and Ridgway cases, supra, the court said at page 15 of 149 Iowa, page 1012 of 127 N. W.:

''His right as one of the public is entirely different from his right to the highway as a means of enjoying the free and convenient use of his abutting property. This right is a special one, and, if it is of value to him, it is property which can not be taken from him without compensation. * * * Elliott on Roads & Streets (2d Ed.) section 877. It goes without saying that the value of the land is materially lessened by cutting off convenient access thereto, just the same as is the value of a city lot.''

It is true that in the McCann case, the highway vacated was in the country, where the title to the fee is in the abutter with an easement in the public. But the principle under discussion is just as applicable as it is to a town or city street where the fee title is in the municipality in trust for the use of the public as a street.

In Hubbell v. City of Des Moines, supra, 173 Iowa 55, 66, 154 N. W. 337, 341, suit was brought to enjoin an ordinance vacating an alley adjacent to the Coliseum. There was adequate access on Grand and Locust Streets, and there were no openings from the building onto the alley. Relief was denied plaintiff because the court held that ''The record does not disclose the interference with any substantial right of exit and entrance.'' However, on pages 60 and 61, the court said:

''The fee of the street is in the city. The·peculiar right of the abutting property owner is limited to the use of the street in connection with his property. Of course, he has a common right with the public to the use of the street. As an abutting landowner, he may have a distinct and different right. The plaintiffs, as abutting property owners, have a right to a means of egress and ingress. The street or alley having been established

by proper authority, the right through that instrumentality of ingress and egress is created. This is a substantial right, and, at certain points abutting their property, of great value; at other points, of practically no value. To interfere with the free and convenient use of ingress and egress, to shut off access to their property entirely by the vacation of streets or alleys, would be, in some instances, to destroy the value of the property itself—at least until such time as aerial navigation has been perfected. There is no question, under the rule laid down in this state, and as the law now stands, that the vacation of a public street or alley may be a substantial injury to the owner of abutting property, by the destruction of his right to the larger and fuller enjoyment of his property, resting in the existence of the street or alley.''

And in the same opinion, page 64, in speaking of the reason given in the Ridgway case, supra, for overruling Barr v. City of Oskaloosa, 45 Iowa 275, the court said:

''But, whatever the purpose may have been, it still remains established as the law of this state that an abutting property owner, whose right of egress and ingress has been substantially interfered with by the vacation of a public street or alley, has the right of action for damages which may result to him personally by such vacation, and it does not matter whether you call it an easement in the street, a vested right to the use of the street, or a claim for damages. This court is committed to the doctrine that he is entitled to recover if the free access to his property and the improvements thereon, through the street and by means of the street, has been substantially interfered with.''

It is true that on page 74 of the opinion in the Hubbell case, the court said:

''In vacating a public street, the damages to abutting property owners are of necessity consequential. * * * We do not think the vacation of a street is the taking of private property in contemplation of our Constitution.''

Whether the last statement is correct might depend largely on the purpose of the vacation. Certainly, the permanent closing of a street or alley for its customary use would not be a public

use as contemplated by the constitution. The statement can have no application in this case before us for here there is no vacation, since the easement of way belonging to the abutters is to be taken and appropriated to a public use in the form of an additional servitude. And the statement of the court is hardly apropos in the Hubbell case, since the alley was vacated to be joined to a public park, and might well be called a taking for a public use. Certainly the plaintiff's special right of access to the alley, and his actual entrance thereto from the Coliseum, were prevented and destroyed, because it was taken and appropriated for public use as a park in a constitutional sense. This right had a value and had the plaintiff been making use of such access at that time its appropriation would have been compensable. In the Borghart case the square was vacated and sold by the city to be used for the building of a church. The court said its destruction as a square was presumed to be for a public use. The other statement of the court, that the damages to an abutting owner from the vacation of a street are consequential, is of very questionable soundness, and results from a misconception of the true relation between the proprietary right or easement of access and the tangible abutting land to which it is an incident and without which it has no real value. The right of access and the land itself cannot and ought not be considered separately or as distinct entities. This is true notwithstanding the easement or right of access may be separately conveyed by deed. Hileman v. Chicago G. W. Ry. Co., 113 Iowa 591, 85 N. W. 800. This conception of the relation is stated by Judge Dillon, in 3 Municipal Corporations, 5th Ed., section 1125, thus:

"The private rights in a street, appurtenant to abutting lots, *arise by operation of law from contiguity,* like rights for the adjacent and subjacent support of land, and their existence is to be presumed. These easements are *purely incorporeal rights,* having in themselves only a nominal value, and dependent for substantial value upon the effect which their destruction has upon the abutting property. Being incorporeal, they are necessarily appurtenant to the abutting property, and *cannot exist severed from* or independently of it."

The lot and the easement are a unit, and are used and en-

joyed as a unit, and if the easement of access is terminated in any way the entire unit is injured, not consequentially, but directly. It would be just as reasonable to say that an impassable barricade around a business property, or the cutting of the airline to a deep-sea diver, are not direct injuries because there is no actual contact with the property, or the diver. If a farmer operates an 80-acre farm which he has access to by a roadway easement over his neighbor's adjoining land, his farm consists of the 80 acres and the roadway, and the destruction of the latter is just as much a direct injury to his farming venture as would be the loss of a part of his land. The same injury occurs, and the same principle of law applies, when the right of access to a street is taken from an abutting property. Most certainly, the destruction of or interference with the access itself, or right of access—the easement in the street—which right is actually invaded and appropriated by the city, is a direct injury and damage to that special right, and also to the corpus of the property, of which that right is a part. This damage is direct and not consequential. Suppose a farm owner has an easement for passage over his neighbor's land and the neighbor puts a fence or other barricade across that passageway, would anyone say that this interference or stoppage was not an actual invasion of and a direct taking or appropriation of his easement? And would anyone say the damages were not direct, instead of consequential?

In Dawson v. McKinnon, 226 Iowa 756, 766, 770, 285 N. W. 258, 263, 265, it is stated:

"An easement has been defined as a privilege, or right, without profit, which the owner of one piece of real estate may have in the real estate of another, or, conversely, it is a service which one tract of land owes to another tract."

In that case, the court said:

"It is our judgment that the defendant commissioners have taken the larger part of the drive, street, or way over which the appellant had an easement, and that in doing so they have destroyed a property right which she had therein, and have very seriously interfered with and impaired the access which

she had to and from her land, causing her damage which she is entitled to have established in the manner required by law."

So, in the case before us, the City, as the owner of the street or servient estate, owes an easement of way, or service, to the abutting land, or dominant estates, which it is seeking to destroy as to them and to take and appropriate to itself. It cannot pay this obligation by destroying it or seizing it.

The case which the appellants rely upon as decisive of this division of the opinion is Nalon v. City of Sioux City, 216 Iowa 1041, 1043, 250 N. W. 166, 167. The plaintiff owned a residence lot facing south on West 13th Street. Back and to the west of the lot, Perry Creek ran in a southeasterly direction, forming a horseshoe loop with the opening thereof a short distance west of plaintiff's lot. Under a statutory provision for flood control, the city cut a new channel for the creek across the opening of the loop, just a few feet west of the lot line. The new channel extended across West 13th Street at an angle, somewhat less than a right angle. It was about 20 feet wide and 25 feet deep. It was not bridged and access to plaintiff's lot was completely cut off from the west. Plaintiff sued for damages, alleging, as grounds, trespass on the lot by piling bricks and debris thereon, removal of a shade tree, and "that access to the street is now more difficult." Defendant moved for a directed verdict, which motion was overruled, but the two first-mentioned grounds for recovery were withdrawn by the court. The parties then agreed that the jury might be discharged and the court could assess the damages, which it did in the sum of $1,250. One ground of the motion was, that only indirect damages were claimed, arising by reason of a change in the course of the stream to a position nearer plaintiff's property, and that there was no allegation of any "taking of plaintiff's property." This was the nature of the defense stated in appellant's brief and argument. The error relied upon for reversal is thus stated by the appellant:

" '1. The sole proposition presented on this appeal is that the court erred in overruling defendant's motion for a directed verdict and should have held as a matter of law that there is no right of action for an incidental injury to the value of prop-

erty caused by a proper work of public improvement where there is no direct taking of plaintiff's property or trespass thereon.' ''

The following propositions of law were stated by appellant:

'' (4) There is no constitutional prohibition against damage or incidental injury to private property by public authority unless there is a 'taking' in a physical sense. (5) Plaintiff is not entitled to recover damages for incidental injuries suffered due to a proper work of public improvement. (6) The right of abutting owners in Iowa to recover for a change of grade of streets is purely statutory and does not include the right to damages for any other type of public improvement.''

The burden of appellant's argument was that there was no liability for indirect or incidental injury ''where there was no 'taking' within the constitutional prohibition.'' The appellee accepted this challenge. That was the only issue argued or presented to this court. Appellee cited and relied on the Long, Borghart, and Ridgway cases, supra. This court affirmed plaintiff's judgment. Justice Donegan, speaking for the court, set out the sole assignment of error noted above, and said on pages 1043, 1044, and 1046 of 216 Iowa, page 167 of 250 N. W.:

''Appellant's brief and argument is devoted to this one proposition, that there was no taking of plaintiff's property within the meaning of the constitutional provision against taking property without compensation, and that any and all damages claimed by appellee resulted indirectly from the construction of the ditch adjacent to the appellee's property and are incidental and consequential. Article 1, section 18, of the Constitution of the state of Iowa, provides as follows:

'' 'Private property shall not be taken for public use without just compensation first being made, or secured to be made to the owner thereof'.

''Appellant cites authorities in support of its contention that there can be no taking of private property within the contemplation of this provision of the Constitution unless there is a physical appropriation of the property itself, and that, where

the property is not physically taken, any damages resulting to such property because of a public improvement are indirect and consequential and, in the absence of statutory provision authorizing payment thereof, cannot be collected against a city when acting in its governmental capacity. It may be conceded that, in construing provisions such as that in our Constitution, which merely provide for compensation for the taking of property, the authorities quoted by appellant are in conformity with appellant's contention. It does not necessarily follow that there may not be, in any case, a *taking* of property without the actual invasion of the physical property itself. *On the contrary, there is ample authority in support of the rule that, even where the provision is only for compensation for the taking of property, there may be a taking of property, by preventing or substantially interfering with the owner's access to his property from a public street.* * * *

"*Under the rule that a substantial interference with access to property by means of a public street does amount to a taking of property for which damages may be collected, there was evidence to carry this case to the jury, and the trial court did not err in overruling the appellant's motion for a directed verdict.*

"*As this is the only question which has been presented to the court under the errors relied upon for reversal, the ruling and judgment of the trial court must be, and is, hereby affirmed.*" (Italics supplied.)

The court quoted from the Long, Ridgway, and Borghart cases, supra, in support of its decision.

We have set out the record fully in the Nalon case because the appellees insist that it is neither controlling nor applicable, since the public work constructed was not for the improvement of the street, but was, in fact, a diversion from, and detrimental to, its use as a street, and that the decision for that reason is right in holding that such diversion was a "taking" of the right of access in a constitutional sense. In other words, they contend that the decision is right but a right reason was not given for it. If it be conceded, as a matter of argument, that the appellees are right in their contention, and without passing upon the merits of this supposed ground of recovery, we need only say this ground of recovery, or reason for the decision, was never mentioned at

any time in the trial, or in the appeal proceedings. The only question presented below or on appeal was whether a substantial interference with access to an abutter's property to or from a public street was a taking of private property under the eminent-domain provision of the Iowa Constitution. The court definitely and squarely decided that it was. The appellees also insist that the Long, Borghart, and Ridgway cases, supra, have no application because they are street-vacating cases, thereby diverting the streets from their proper use as such, while the case before us is a street-improvement case. This is a distinction without a difference in the legal consequences. The abutting owner has a proprietary right, or easement, of access in the street along his property, which is subordinate to the right of the state or of a city or town in and to said street, so that the municipality may destroy the right by vacating the street, or it or the state may substantially impair or interfere with that access or right of access by improving the street for the better service or safety of the public, but in either event compensation must be made to the abutting property owner for the injury sustained by him.

Two times since the decision in the Nalon case was rendered we have cited and approved that decision. See Graham v. City of Sioux City, 219 Iowa 594, 596, 258 N. W. 902, 903, where, through Justice Mitchell, the court said:

"The city concedes that this court has heretofore held that an obstruction to access to property is a 'taking' for which the property owner is entitled to damages."

And in Prymek v. Washington County, 229 Iowa 1249, 296 N. W. 467, again speaking through Justice Mitchell, the court held that the vacation of a country highway, destroying or seriously interfering with a person's right of access to his property which does *not* abut on the vacated highway, is the destruction of a property right entitling him to damages. The court quotes from the Nalon case that such interference with access is a taking of property.

We now hold that the destruction of the rights of access, light, air, or view, or the substantial impairment or interference with these rights of an abutting property owner in the highways or streets adjacent to his property, by any work or structure

upon such highways or streets, intended for the improvement thereof, done by the state or any governmental subdivision thereof, is a "taking" of the private property of said owner within the purview and provisions of section 18, Article I of the Iowa Constitution.

For other authority supporting the proposition that these special rights are property which cannot be destroyed or appropriated without liability, see Occo Realty Co. v. New York, C. & St. L. R. Co., 33 Ohio App. 414, 169 N. E. 719; Siemers v. St. Louis Elec. Term. Ry. Co., 348 Mo. 682, 155 S. W. 2d 130 (Subway); Arrow Press Corp. v. Allegheny County, 90 P. L. J., Pa., 37; Andrews v. Cox, 127 Conn. 455, 17 A. 2d 507; Rose v. State, 19 Cal. 2d 713, 105 P. 2d 302; People v. Ricciardi, Cal. App., 107 P. 2d 647; Hirt v. City of Casper, 56 Wyo. 57, 103 P. 2d 394; Boal v. City of Chicago, 301 Ill. App. 536, 23 N. E. 2d 237; Crane v. Hahlo, 258 U. S. 142, 42 S. Ct. 214, 66 L. Ed. 514; Campbell v. Arkansas State Highway Comm., 183 Ark. 780, 38 S. W. 2d 753; City of Atlanta v. Gore, 40 Ga. App. 70, 169 S. E. 776; In re Forsstrom, 44 Ariz. 472, 38 P. 2d 878; 20 C. J. 689, section 152; 29 C. J. S., Eminent Domain, 934, section 122; Great Northern R. Co. v. State, 102 Wash. 348, 353, 173 P. 40, 42, L. R. A. 1918E, 987, where the court said:

"In our opinion, the theory that property rights are ever to be sacrificed to public convenience or necessity without just compensation * * * should find no lodgment in American jurisprudence."

Breinig v. Allegheny County, 332 Pa. 474, 480, 2 A. 2d 842, 847, in which the court said:

"Where land is taken or purchased for highways, the abutting owner retains, as an incident to ownership of the remainder of his land, the right of access, or of ingress and egress. This right cannot be taken from him unless compensation is made therefor under the law. It is a property right, protected by the Constitution."

See, also, Cain v. Aspinwall-Delafield Co., 289 Pa. 535, 541, 137 A. 610; Burger v. City of Wichita, 132 Kan. 105, 294 P. 670; Edmison v. Lowry, 3 S. D. 77, 52 N. W. 583, 17 L. R. A.

275, 44 Am. St. Rep. 774; 2 Elliott, Roads & Streets, 4th Ed., section 882; 3 Dillon, Mun. Corp., 5th Ed., section 1123; 25 Am. Jur., Highways, 448, 451, sections 154, 155; pages 611, 613, sections 318, 319.

"* * * an abutting owner's easement for the passage of light and air over a public highway cannot be taken or damaged without just compensation. So, also, an owner's right of access to his premises is a valuable property right. The construction of an impassable barrier around property, by which the owner's access to it would be destroyed, would be no less a taking of it in the sense of the Constitution than would be the owner's expulsion from the premises." 18 Am. Jur., Eminent Domain, 789, section 158.

When it is conceded that the easement of access is property, it necessarily follows that when it is appropriated for a public use, thereby depriving the owner of its use, this is a taking in the constitutional sense. The destruction of this means of access to a piece of land for public use is a taking of property, just as much as the destruction of a building on that land for public use is a taking.

As stated before herein, the interference with these special rights of the abutter, which will entitle him to relief or protection, must be material and not merely a matter of inconvenience. Cases involving such complaints have been before this court a number of times. In Randall v. Christiansen, 76 Iowa 169, 40 N. W. 703, relief was denied to the complainant, under a statute prohibiting the destruction of ingress or egress to property by those in charge of highway work. In Haydon v. Whitaker, 156 Iowa 87, 135 N. W. 361, relief was granted. The decision in each case must be ruled by the facts thereof.

III. What merit is there in the contention of the appellees that there is no liability to an abutting owner for destroying his rights of access, light, air, and view, because he was fully compensated therefor when the roadway was condemned, purchased, or dedicated?

In our judgment, the proposition is unsound. The conclusion is unsound because the premise has no basis in fact. The abutting owner does not part with these special proprietary

rights or easements when the land is acquired for highway purposes, therefore there is no ground for saying that he has been paid or compensated for them. These rights are inherent in the transaction and are not parted with in the acquisition of the land for highway purposes, but are reserved in the one parting with the land and run with the land for the use of all future owners, even though not mentioned or reserved in the granting instrument. Long v. Wilson, 119 Iowa 267, 272, 93 N. W. 282, 60 L. R. A. 720, 97 Am. St. Rep. 315. Being property or proprietary rights which the abutter retains, it cannot, in reason, be said that he was paid therefor, or that they were included in any assessment of damages. The fee in the highway was parted with and taken by the public subdivision, but subject to and burdened with the easements of way, light, etc. These easements or incorporeal hereditaments were never paid for. The person who purchases land from his adjoining neighbor subject to a roadway easement in the latter can acquire that easement in the future only by paying for it. So also must the public body pay for the easement of the abutting owner, if at some future time it wishes to appropriate it to better serve those who use the highway. It has a paramount right in the highway for highway purposes, and, conversely, the rights of the abutting owner are subordinate to the highway rights of the public, and the state or municipal body may appropriate the special easements of the abutter but it must pay just compensation therefor. It cannot confiscate them and glibly say to the abutter "damnum absque injuria." As said by 1 Lewis, Eminent Domain, 3d Ed., section 121:

"* * * These private rights or easements are the presumed, as well as the real, consideration for the grant or dedication of a part of the tract to public use. * * * If, instead of making a gift of the streets to the public, the proprietors should voluntarily grant the streets for a consideration agreed upon and paid by the public, it would still be true in fact, and therefore presumed by law, that, in fixing the consideration to be paid, the parties had in mind the advantages to be derived from the use of the streets. That is, the consideration to each proprietor would be the right to make use of the streets in connection with his lots, and a certain sum of money paid. The

first part of this consideration would be utterly fallacious, unless the right in question is protected by the law of the land the same as any other right. To make the right a part consideration of the grant, and then to allow the public to invade or destroy it at pleasure, would be a fraud which the law will neither impute nor allow. Therefore, in the case of such a grant, there arises by operation of law a private right to use the streets in connection with the lots of each proprietor, which is as inviolable as any other right of property.''

See, also, Lahr v. Metropolitan Elev. Ry. Co., 104 N. Y. 268, 290, 10 N. E. 528; Pearsall v. Board of Supvrs., 74 Mich. 558, 42 N. W. 77, 4 L. R. A. 193.

We think there is another answer to this contention of the appellees. It is true that when damages are assessed or compensation awarded in the condemnation of land for a highway, the assessing tribunal may be presumed to have taken into consideration all reasonably foreseeable uses, improvements, disadvantages, and servitudes in connection with the highway which might impair the use of, or depreciate the value of, the remainder of the abutter's property. And it is a sound policy that an assessment ought, if reasonably possible, be made once for all time. Of this Lewis said, in 1 Eminent Domain, 3d Ed., section 126:

''It has been said, in some cases, that a jury or other tribunal for assessing damage, when a street is laid out, take into consideration the possibility of future damage by improving the street, and increase their allowance accordingly. We think the fact is otherwise, but the impossibility of forming an accurate or even approximate estimate of such damages is sufficient to rebut any presumption of their having been included in the assessment. Who can estimate what the needs of the public will require, or the whims of public officers suggest? To attempt to include such damages is to send the jury into the realm of pure speculation. The more reasonable, the more practicable and the juster view is that such damages are not the subject of assessment in such cases.''

The plats in which Broadway and the abutting properties

are included were dedicated in 1854–1857. How can it be conclusively presumed that the conceded damages which will be sustained by abutting property if this viaduct is built were considered or reasonably foreseeable at that period? The plats and blueprints show the contour of the ground to be level. If there had been a gully or deep ravine, some street improvement necessitating a serious interference with access to the property might have been anticipated. There was no railroad crossing until 1865 and after. In the Sauer case, supra, 72 N. E. 579, affirmed 206 U. S. 536, 542, 27 S. Ct. 686, 687, 51 L. Ed. 1176, 1180, frequently cited by proponents of the views of the appellees, after referring to the presumption above referred to, the court said:

"The rule may be different as to peculiar and extraordinary changes made for some ulterior purpose other than the improvement of the street, as, for instance, where the natural surface has been changed by artificial means, such as the construction of a railroad embankment, or a bridge over a railroad, making elevated approaches necessary."

For other authority that unusual or out of the ordinary changes or improvements, or those made necessary by artificial conditions, such as elevated grades over railroads, or which inflict special and peculiar damage on abutting property, will not be presumed to have been contemplated or anticipated and considered when the highway was acquired, see 18 Am. Jur., Eminent Domain, 847, section 217, and 1 Lewis, Eminent Domain, 3d Ed., section 138. See, also, City of Pueblo v. Strait, 20 Colo. 13, 36 P. 789, 24 L. R. A. 392, 46 Am. St. Rep. 273.

Vann, J., dissented in the Sauer case upon the ground that such a structure as a "new and independent street in the form of a bridge, fifty feet high and sixty-three feet wide, extending lengthwise through block after block over an existing street, which, graded and paved for years, is left undisturbed except by the huge columns supporting the elevated structure, is neither the improvement of the street as a street, nor a proper street use sanctioned by precedent, or coming within the reasonable contemplation of the parties when the fee of the surface street

was acquired from the abutting owner, who has no access to the aerial street from his own premises * * *.'' 180 N. Y. 27, 34, 72 N. E. 579, 580.

On the appeal to the United States Supreme Court that court did not pass upon the question before us, since it held that it was bound by the holding of the state court, but there is much unnecessary comment in the opinion on the point. Justice McKenna dissented and Justice Day concurred in the dissent. After stating that the majority had misconceived the true basis of earlier decisions on the question, and Story v. New York Elev. R. Co., 90 N. Y. 122, 43 Am. Rep. 146, McKenna, J., said:

''I am not insensible of the strength of the reasoning by which this court sustains that conclusion [that there was no additional servitude], but certainly all lawyers would not assent to it. Indeed one must be a lawyer to assent to it. At times there seems to be a legal result which takes no account of the obviously practical result. At times there seems to come an antithesis between legal sense and common sense.'' 206 U. S. 536, 559, 27 S. Ct. 686, 694.

■ IV. Appellees stress the fact that the legislature has plenary power over highways; that the rights of the abutting property owner are subordinate to those of the public and must give way to the conveniences and necessities of the traveling public; and that the Highway Commission has power to construct this viaduct. These rights and powers may be conceded, but nevertheless they are not absolute or unlimited and unrestricted. They are all subject to the constitutional inhibition that private property must not be taken for public use without just compensation. Even the legislature and the other subdivisions and agencies of the state are subject to this limitation. The power of the legislature over highways and streets is plenary in that it may take any needed private property for their establishment, maintenance, or improvement, but it is restricted in that it must pay just compensation therefor. The power of the highway commission is, of course, likewise limited. The safety of the public, in these days of speedy locomotion and congested traffic, ought to be guarded and maintained, and public works and improvement

to that end should be encouraged by the courts whenever it can be done, but the courts cannot ignore sound and settled principles of law safeguarding the rights and property of individuals. This viaduct may be of great convenience to the public generally, but the properties of the abutting owners ought not be sacrificed in order to secure it.

In support of their contention that the abutting owners will suffer no "legal" damages, that is, that they will suffer no damage for which they are legally entitled to recover, the appellees cite and rely upon Pillings v. Pottawattamie County, 188 Iowa 567, 568, 176 N. W. 314; Lingo v. Page County, 201 Iowa 906, 208 N. W. 327; Talcott Bros. v. City of Des Moines, 134 Iowa 113, 109 N. W. 311, 12 L. R. A., N. S., 696, 120 Am. St. Rep. 419; Peck v. Olson Constr. Co., 216 Iowa 519, 245 N. W. 131; Sauer v. City of New York, supra, 72 N. E. 579; Id., 51 L. Ed. 1176; Willis v. Winona City, 59 Minn. 27, 60 N. W. 814, 26 L. R. A. 142; Selden v. City of Jacksonville, 28 Fla. 558, 10 So. 457, 14 L. R. A. 370, 29 Am. St. Rep. 278; Colclough v. City of Milwaukee, 92 Wis. 182, 65 N. W. 1039; Home Bldg. & C. Co. v. City of Roanoke, 91 Va. 52, 20 S. E. 895, 27 L. R. A. 551; Brand v. Multnomah County, 38 Or. 79, 60 P. 209, 50 L. R. A. 389, 84 Am. St. Rep. 772; Sears v. Crocker, 184 Mass. 586, 69 N. E. 327, 100 Am. St. Rep. 577. A number of these decisions from other jurisdictions have no application to the proposition discussed in division I of this opinion, since they hold that the decisions would have been otherwise had there been a statutory provision for damages caused by a change in an established grade.

Respecting the holding in these cases on matters involved in the other divisions of this opinion, we respectfully disagree.

Much reliance was placed by the trial court and by the appellees upon Pillings v. Pottawattamie County and Lingo v. Page County, supra. Neither of these decisions is applicable to division I hereof since the statutory provision as to damages caused by altering established grades has no application to country highways. The first case was disposed of on a demurrer to the petition and we are bound by the facts as alleged therein. The road was graded so as to leave a cut 6 to 12 feet deep, with perpendicular sides, "destroying all means of convenient passage

between'' the residence and the barns, outbuildings, and well, on the other side of the road. The road was laid out on high ground where it passed the buildings, and then descended to a creek bottom. The hill was cut down to make a fill in the bottom, which improvement must have been anticipated when the road was laid out. We have no fault to find with the result reached. The same is true of the Lingo case. Talcott Bros. v. Des Moines, supra, does not involve an abutting property owner's rights of access, air, or light, but has to do with the right of lateral support, which is a right inhering in land just as the rights of access, etc., do, because of their very nature, and the same principles of law herein stated should apply to such right. We question the soundness of some of the views stated in the opinion. Insofar as any pronouncements of law in any of the three cases last mentioned are contrary to the questions of law decided herein, they are overruled.

The judgment and decree is reversed and remanded and the district court is directed to render judgment and decree in conformity herewith.—Reversed and remanded.

All JUSTICES concur.