281 P.2d 128

COUNTY OF MOHAVE, Appellant,

v.

Lila CHAMBERLIN, Appellee.

No. 5894.

Supreme Court of Arizona.

March 15, 1955.

Carl D. Hammond, County Atty., Mohave County, Frank X. Gordon, Kingman, for appellant.

Brice I. Bishop, Phoenix, for appellee.

UDALL, Justice.

Defendant (appellant) County of Mohave, one of the political subdivisions of the State of Arizona, has appealed from a judgment for damages in the sum of $5,000 entered against it in favor of plaintiff (appellee) Lila Chamberlin. The case was tried to a jury and a general verdict rendered. No formal written judgment was entered nor were any special findings made. The parties will be herein referred to as they were designated in the lower court—plaintiff and defendant (or the County).

While the suit was instituted in the superior court in Mohave County, on plaintiff's motion for a change of venue under section 21–106, A.C.A.1939, it was ordered transferred to Yavapai County for trial. Later, by order of court, the

424

City of Kingman, a municipal corporation, was made a party defendant to the action under an amended complaint, but at the close of plaintiff's case the court granted the city's motion to dismiss and they are not a party to this appeal.

The amended complaint undoubtedly states a claim for relief upon the theory of inverse eminent domain and it was upon this theory that the case was tried and judgment entered. It is alleged (a) that without instituting condemnation proceedings and without consent of plaintiff the County did appropriate for its own use and benefit certain lands owned by plaintiff by causing sewage effluent to flow upon said lands and pool around the base of her water well, thus contaminating and rendering unusable for domestic purposes the water therein; (b) that this sewage effluent has since said time polluted the air over said lands with foul odors so that plaintiff is unable to enjoy the use of said lands; (c) that these acts of defendant have caused plaintiff's sole water supply to be of no value and thus rendered the land unfit for occupation, and (d) that by reason of the wrongs committed by the County the plaintiff has been damaged in the sum of $10,000 as and for depreciation in the value of her property.

The defendant's answer claims that the complaint fails to state a claim upon which relief can be granted; it makes certain admissions and denials; and sets up contributory negligence on the part of plaintiff in that she or her predecessors in interest had caused an unnatural depression near the well by the removal of sand and gravel from a pit near thereto and that this act was the direct and proximate cause of the sewage effluent pooling on the lands of plaintiff.

Other than objections to the giving or failing to give certain instructions, the principal assignment of error is in substance that the evidence does not make out a prima facie case justifying the permanent relief granted under the theory of inverse eminent domain. A consideration of this assignment requires a careful recitation of the facts.

Plaintiff, Lila Chamberlin, a resident of Kingman, acquired the property in question from F. E. Buchanan, et ux. on January 7, 1948. This land is a portion of the NW¼ of Sec. 4, Twp. 20–N., R. 17 W., described by lot numbers, comprising approximately 137 acres, situated about 5 miles southwest of the town of Kingman. The southeast portion of lot 3 and part of lot 4 thereof is traversed by U. S. Highway 66 (both the old and new route) which there parallels the west bound track of the A. T. & S. F. Railway. Plaintiff testified that she had never lived upon the property; that it was not bought for a cattle ranch as she owns no cattle, nor has she ever done any farming thereon—though her predecessor utilized a small garden plot and had raised a few chickens; that it was acquired primarily for its value as frontage property along this heavily travelled highway. During the period in ques-

tion the only occupant of her holdings was a tenant operating "Pete's Drive Inn", an eating place conducted in a 20 x 20 foot frame building. The tenant paid a monthly rental of $50 plus $20 for the adjacent small house in which he lived. The source of domestic water for the tenant's use was a well, located in a northwesterly direction approximately one-fourth mile distant, from which it was piped to a nearby water tank.

Some 3.6 miles northeast of plaintiff's property there is a sewage disposal plant which is located just within the Kingman city limits. In the early days the Santa Fe Railway Company built a sewer line leading to this plant, to care for the sewage from its properties in Kingman. The plant, which now serves all of the inhabitants of Kingman as well as the Railroad, was rebuilt during the depression days of 1932. Beginning in the year 1936 it was operated by Mohave County until the City of Kingman, after being incorporated on January 21, 1952, took over its operation on July 1 of that year. Apparently it is a badly overloaded plant.

Normally the effluent being discharged from the plant ran into an adjacent settling pool and then on into the nearby large arroyo known as "Railroad Pass Wash" which it followed for a mile or so before disappearing in its sands as the arroyo does not normally carry a living stream—i. e., it only has running water following a heavy rainfall on the water shed. This was the pattern until some time in the Spring of 1952 (March) when a party employed by the County with a grader bladed out two ditches · from the settling pool on down the wash to the neighborhood of plaintiff's land.

Thereafter on May 21, 1952 heavy rains fell and flood conditions ensued, causing some of the sewage effluent to flow down the wash and be deposited in a gravel pit within 25 to 50 feet of plaintiff's well. The sanitary engineering division of the State Department of Health learned of this condition and on May 26th their inspector gave to plaintiff a written notice that she was violating the sanitary code. In the blank therein entitled "Remarks" it was stated:

"Due to sewage effluent pooled within 40′ of well, water must be properly treated for human consumption or another source of water supply must be obtained."

The plaintiff was asked: "did you ever repair that well?" She answered: "No sir, I don't expect to." Apparently the water from this well has not been used since that time.

Plaintiff immediately reported this condition to the Board of Supervisors who promptly diverted the water from the channel running past plaintiff's well into another channel of the wash outside plaintiff's property. The County did offer to bring a bulldozer in and cut the pool by the well, which offer was refused and at

no time was the county equipment used on plaintiff's land. To meet the emergency and prevent the temporary closing of the Drive Inn the County further offered to and did haul water to fill plaintiff's tank three times. Thereafter the plaintiff made an unsuccessful effort to obtain water from the Santa Fe. Failing in this she then obtained water, without authorization, from the Health Department from what was known as the "Lewis Well", located above her property, until October, 1953, when they threatened to stop that use unless she would install an automatic hypochlorinator.

No effort whatsoever was made by plaintiff to recondition her own well as she considered it "gone". However there is not a scintilla of evidence in the record that the water from her well had ever at any time been tested to determine whether it was in fact contaminated and therefore unfit for human consumption. Nor do we find any evidence to substantiate plaintiff's contention that as a result of the single occurrence relied upon the well was permanently destroyed or the water therein permanently condemned by the public health officials as a source of domestic water supply.

This well is located within the bed of Railroad Pass Wash "on a small ridge" at a point where there are a half dozen or more shallow channels (one to two feet deep) which shift as new floods occur. The evidence shows that this wash widens out as it leaves the Canyon and gets down into the valley in which plaintiff's lands lie and where it crosses her property it is 780 feet between banks and covers some seven or eight acres of ground. It further appears that this large arroyo, with its numerous tributary side washes, serves a huge drainage area which includes the ground comprising not only the heavily populated town of Kingman but also the recreational area in the Wallapai Mountains 16 miles distant.

The well itself is a dug well 108½ feet deep, imperfectly cased up with oil drums which have the tops and bottoms cut out. A water pipe containing the "sucker rod" extends to the underground water. Plaintiff's predecessor in interest testified that "there was 11 inches of water in the bottom of that well and it run very fast. * * * it was running steady. We couldn't pump it out * * *. It was a regular underground current there." At the surface there is a small pumphouse structure inside which is a cement wall to protect the well. An electric motor controlled from a switch at the Inn, furnishes the lifting power.

The sanitary engineer testified primarily from his own observation that by reason of the well's physical location in the bed of the wash, it being an open well with no specific ceiling connection or topping, contamination was possible in flood time and that "any surface run off in that wash could contaminate that well." He further testified:

"Q. Do I understand you that if there were no sewage effluent in that wash it would still be impossible to make a safe source of water? A. I

don't believe in its location that well could be made an accepted supply so that you could have dependence on it.

"Q. Would you say even before this all happened that that would be your opinion? A. It would be my opinion no matter what had happened that that sewage that you have got there with the major portion of Kingman sitting up there, sprung from all of the washes into that wash, and I have seen it running through right hard, and when running into that wash I wouldn't have any confidence in that well no matter what you did to it."

This witness was laboring under the erroneous impression that in digging the well they only went through sand and gravel whereas this is refuted by those who were more familiar with the facts for the only competent evidence on this point is to the effect that hard formations of schist were encountered long before water was found at a depth of 108½ feet. From the witness' own inspection with a flashlight he estimated that the water stood at a depth of sixty feet.

The sole occurrence relied upon by plaintiff as constituting a taking of her property through the contamination of the water supply occurred during the month of May, 1952. It is most significant that the record conclusively establishes the sewage effluent issuing from the plant then operated by the County had never previously reached the plaintiff's property or caused her any annoyance or damage. The plaintiff's own testimony was to the effect that she first observed this unusual condition when, on May 21, 1952 she saw the sewage effluent running into the gravel pit adjacent to her well. Nor did a similar incident occur thereafter and for aught that appears it may never occur again. The plaintiff testified:

"Q. * * * Did you see any effluent come down to this pit or near this well after May 26th? A. No; it was cut off I told you; on the 31st on Saturday morning after the well was condemned on the 26th.

"Q. This was the only time that it came down? After that it was cut off so that it wouldn't come down? A. It went over to that little bench across the wash probably 700 or 800 feet."

which was not on her land. It further appears that the effluent lodged in the gravel pit "dropped down out of sight almost over night" though the plaintiff maintains that it "continued to be wet and smelled bad for months." This pit was thereafter completely filled in with boulders, rock and gravel by a flood which occurred on August 10, 1953 shortly before the trial. The plaintiff offered no evidence that this sewage effluent *permanently* fouled the soil adjacent to the well, as a matter of fact the only competent evidence on the point was from the sanitary engineer who testified that natural purification

through sunshine and other elements would have killed or eliminated any harmful bacteria or intestional parasites as well as the odor within thirty days.

The sanitary engineer, who is the only one to testify as to any possibility of contamination from an underground flow, stated:

" * * * if there is as much as one mile of underground flow in those types of soil, that is, in that wash, there could be no contamination."

The plaintiff's well is more than three miles distant from any surface flow except at flood time.

The alleged pollution of the air over plaintiff's land from malodorous conditions to the extent she was unable to enjoy full occupancy necessarily has reference to the time when sewage effluent ponded near the well in May of 1952. As shown, that condition was short lived (30 days) and even while it existed—to be annoyed by this odor one had to be near the well site which was some 1,300 feet (according to scale of map, Exh. A) from the Drive Inn and residence owned by the plaintiff, and the prevailing winds, according to the testimony, were away from and not toward these inhabited places.

■ With these facts before it, the court denied a motion for an instructed verdict and, over vigorous objection of defendant, instructed the jury that:

" * * * the measure of the plaintiff's damages is the difference in the market value of the whole of plaintiff's property immediately before and after the injury, if any, which was proximately caused by the injury."

This yardstick only applies when there is a *permanent* "taking" for public use (under article 2, section 17, Constitution of Arizona) of certain of the rights that constitute property, while leaving the balance intact. See Maricopa County Municipal Water Conservation Dist. No. 1 v. Warford, 69 Ariz. 1, 13, 206 P.2d 1168, 1176, which is a similar inverse eminent domain case. Cf. State v. Dart, 23 Ariz. 145, 202 P. 237. We are of the opinion that this instruction should not have been given in the instant case because from the evidence only one inference can properly be drawn and that is that there was no permanent "taking" of plaintiff's property. There was no showing that plaintiff's well was permanently contaminated, nor was there a showing as must needs be in cases of this nature that the overflow of sewage effluent onto plaintiff's land was an event of intermittent but inevitably recurring character. The single occurrence on which plaintiff relies falls far short of meeting such a test. Since there was no permanent injury shown the evidence as to diminished value of the property was inapplicable and the giving of an instruction applying such a yardstick constituted reversible error.

■ We agree with plaintiff that the doctrine of contributory negligence is not involved and hence the court did not err

in refusing to give the County's proffered instruction No. 2.

Article 2, section 17, Constitution of Arizona provides in part:

"* * * No private property shall be *taken* or *damaged* for public or private use without just compensation having been first made * * *." (Emphasis supplied.)

The defendant County urges that under this provision of the constitution as construed by this court there can be no recovery for other than a "taking" of property, and since no "taking" was shown the judgment should be reversed with directions to dismiss the complaint. It is true that the following statement appearing in the case of In re Forsstrom, 44 Ariz. 472, 479, 38 P.2d 878, 881, if literally applied here would deny recovery for the "damaging" of property as distinct from its "taking". We quote:

"* * * We hold therefore that, whether through inadvertence or intention, the Legislature has failed to provide any method for assessing the compensation due for the 'damaging' of property as distinct from its 'taking' under eminent domain, and that since, under the constitutional provision above quoted, it may not be so damaged without compensation having been first ascertained and paid, if the action of the city is a 'damaging' of petitioners' property, as distinct from a 'taking,' there is no method set forth in our statutes by which such damage

may be ascertained, and the right may not be exercised until the Legislature has acted."

However, from a careful reading of this lengthy opinion we are convinced that the above statement is *dictum,* as the court held there was a "taking" and not a "damaging" hence it was not necessary to a determination of the matter. That case reached this court by the issuance of an alternative writ of prohibition directed against the superior court. The matter grew out of an action brought by City of Tucson against petitioners for condemnation of certain easements of ingress and egress belonging to lands owned by petitioners that would be taken by the construction of a subway and the regrading of certain streets in the city of Tucson. The court after an excellent dissertation, with which we are thoroughly in accord, as to what constitutes a "taking" held that permanent invasion of the property owner's rights of access to their property attendant upon these changes constituted a "taking". This court then determined that inasmuch as the superior court had jurisdiction to hear proceedings for condemnation of property by eminent domain, the alternative writ of prohibition should be quashed and it was so ordered.

As a predicate for the dictum statement set forth, supra, this court held that article 2, section 17, supra, is not self-executing but requires legislative enactment to implement it. The overwhelm-

ing majority of courts to which such a question has been presented do not agree with this holding. See Rose v. State, ·Cal., 105 P.2d 302, 310, affirmed on rehearing, 19 Cal.2d 713, 123 P.2d 505, and cases there cited. Cf. Morgan v. Board of Sup'rs, 67 Ariz. 133, 140, 192 P.2d 236, 241. We cannot but agree with the logic therein. As the Supreme Court of California so well stated in the Rose case [105 ·P.2d 310]:

"* * * the legislature by statutory enactment may not abrogate or deny a right granted by the Constitution. (Cits.) And it follows as a logical conclusion that a right constitutionally granted cannot be taken away by the failure of the legislature to act.

"As stated in the case of State v. Fletcher, 168 Okl. 538, 34 P.2d 595, the constitutional provisions in question were not enacted to protect in any way the sovereign state, but were specifically enacted to protect and preserve the individual rights of the subjects of the sovereign. Certainly, in the absence of provision in the section itself, the framers of the Constitution did not intend to grant a right which the legislature by its refusal or neglect to enact proper remedial machinery therefor might take away or deny."

We firmly believe this pronouncement to be sound. We hold that the ruling in the Forsstrom case, supra, to the effect that the provisions of article 2, section 17, ·supra, concerning compensation for property taken or damaged for public use, are not self-executing is erroneous and it is therefore expressly overruled. It follows that any language therein to the effect that compensation for "damaging" for public use could not be made without legislative enactment is likewise erroneous.

We believe justice requires plaintiff's complaint be not dismissed but that she be given an opportunity to amend her complaint on the theory of a "damaging" of her property as distinct from its "taking", alleging what damages, if any, she suffered by reasons thereof and that a new trial be granted if a proper claim for relief is stated. No hard and fast rule for gauging the amount of compensation for such injury can be laid down on the record now before us. Suffice it to say that for a "damaging", or as some of the courts term it, a "temporary taking", an entirely different yardstick to the one used in the instant case applies. See 15 Am.Jur., Damages, section 110, and City of Norwood v. Sheen, 126 Ohio St. 482, 186 N.E. 102, 87 A.L.R. 1375, with its accompanying annotation.

Judgment reversed for further proceedings not inconsistent with the views herein expressed.

LA PRADE, C. J., and WINDES, PHELPS and STRUCKMEYER, JJ., concur.